WAMESIT POWER COMPANY & another *vs.* STERLING MILLS
& another.

LUTHER W. FAULKNER *vs.* WAMESIT POWER COMPANY.

Middlesex.   March 21, 22, 1892. — March 4, 1893.

Present. FIELD, C. J., ALLEN, KNOWLTON, MORTON, LATHROP,
& BARKER, JJ.

*Right to draw Water from Canal — Obligation of Grantee — Diversion of
Water — Petition for Partition — Parties — Use of Water in Pond —
Expense of Apparatus for measuring Water.*

The owner of lands on both sides of the Concord River, in 1850, built a dam, a
canal, and mills for his own use.   Thereafter, from time to time, he conveyed
mill sites along the canal, with the right to draw specified quantities of water
therefrom when a certain number of cubic feet of water were flowing through
it, and proportional fractional parts of any less volume, and covenanted with the

grantees to enlarge the canal within a specified time. He then, in 1863, sold the residue of his water privileges, subject to the obligation of the grantee to enlarge the canal when necessary, and this residue, in 1866, by mesne conveyances, came into the possession of the plaintiffs. In 1875, the city of Boston, acting under the authority of St. 1872, c. 177, diverted from the Sudbury River, which, by its union with another stream a few miles above the plaintiffs' dam, forms the Concord River, a quantity of water equal to one fifth of the volume of water flowing in the Concord River at the dam. Subsequently the grantees of the residue of the water privileges brought suit against the other mill-owners for a partition of power. Above the dam there was a pond capable of being used as a reservoir, if not constantly drawn upon; and if drawn from only on week days and in working hours it would, when the river was low, enable the mills to receive their full supply on more days than if it was not thus used. There were covenants in the original grants to keep flashboards on the dam during a part of the year, and restrictions as to the use of the water during the working hours of week days, indicating that the grant was not merely of the actual flow of the working hours, but was a right to the flow of the water to be stored in the pond during the other hours of each day and on Sunday. *Held*, that the respondents were entitled to the use of the pond for storage so far as necessary to give full operation to their grants. *Held, also*, that the diminution of the volume of water in the Concord River, caused by the taking by the city of Boston of the water of its tributary, and the payment of damages to the respondents therefor, did not diminish their rights as against the plaintiffs to the quantity of water to which they were entitled under their grants. *Held, also*, that the question of enforcing the plaintiffs' obligation to enlarge the canal, sought to be raised by the answers of the respondents, could not be determined as an incident to the partition, it appearing that other persons whose rights were involved had not been made parties to the proceedings.

The expense of the erection and setting in operation, by a hydraulic engineer appointed by the court, of an apparatus for measuring and dividing the water, should be borne by all the parties to a suit for the partition of a water power, in proportion to the extent of their respective interests.

A second bill in equity, brought by one of the respondents in a partition proceeding against one of the plaintiffs therein to enforce the obligation of the latter to enlarge a canal, was heard and considered in connection with the earlier proceeding. *Held*, that, all the necessary parties not being before the court, that question could not be then determined.

TWO BILLS IN EQUITY. The first bill sought a partition of water power under the provisions of Pub. Sts. c. 178, § 76. The second, brought by one of the respondents in the first bill against one of the plaintiffs therein, sought to charge the latter on its covenant to enlarge a canal. Both cases were heard before *Allen*, J., who in the first case directed an interlocutory decree, and reserved certain questions arising upon the hearing, as well as the whole case upon the report, the evidence of the engineer, the exhibits, and the facts found, for the determination of the full court; the second case was reported for the consideration of the

full court, without a decree, upon the bill, answer, and certain exhibits. The material facts appear in the opinion.

The cases were argued at the bar in March, 1892, and afterwards were submitted on the briefs to all the judges, except *Holmes*, J.

*B. F. Butler & J. N. Marshall,* (*P. Webster* with them,) for the Wamesit Power Company.

*S. Lincoln,* for Luther W. Faulkner.

*W. A. Munroe,* for the Sterling Mills and the Belvidere Mills.

*L. D. Brandeis,* for the Lowell Bleachery.

BARKER, J.   These cases, heard by a single justice and reported for the decision of the full court, were argued together, and the facts found in each are considered in both.

In the first case, the Wamesit Power Company and the American Bolt Company ask, under the Pub. Sts. c. 178, § 76, for the partition of water power. The other suit is brought by Luther W. Faulkner, one of the defendants in the first suit, against the Wamesit Power Company, and seeks to have that company compelled to enlarge the canal which supplies the mills with water, and to use the pond as a reservoir.

The power is created by a dam on the Concord River, at Whipple's Falls in Lowell, and the mills are located in this order: the Faulkner Mills, the Chase Mills, the Sterling Mills, the American Bolt Company's Works, the Belvidere Mills, the Wamesit Mills, the Wood Mills, and the Lowell Bleachery. The Wamesit Company has other works also above the Faulkner Mills, not operated by water power, but which use water from the canal. The water privileges, except those of the Wamesit Power Company, are held under grants from its predecessors in title, and are rights to draw specified quantities of water per second when 288 cubic feet per second are flowing, and proportional fractional parts of any less volume. The grant of the Faulkner Mills is of 25 cubic feet per second; the Chase Mills, 48; the Sterling Mills, 36; the American Bolt Company, 36; the Belvidere Mills, 27; the Wood Mills, 12; and that of the Lowell Bleachery, 36; leaving ungranted 68 cubic feet, and any surplus beyond 288 cubic feet per second. The conveyances were of lands adjoining or near the canal, with rights to water, and the mills have been built by the purchasers or their grantees. The dam and the canal were built about 1850, by Oliver M. Whipple,

and the general situation under which he made conveyances may be thus stated. Having several hundred acres of land on both sides of the river, above and below the falls, he built a dam and canal and mills for his own use. Finding a superabundance of water, he caused an estimate to be made of the amount ordinarily available for power; this estimate was 288 cubic feet per second for the usual working hours. He enlarged and lengthened the canal for the purpose of conveying that quantity when the water in the river was even with the top of the permanent dam. He had a right to use eight-inch flashboards during part of the year. From time to time he conveyed mill sites, with rights to draw a maximum quantity of water during eleven and one quarter hours per day for six days in the week; but when 288 cubic feet per second did not run in the canal, the takers were restricted to their proportionate fractional parts of the actual flow. The Wamesit Power Company acquired its title to the dam and the canal on February 10, 1866, before which time the conveyances of the other mill sites had been made.

The Concord River is formed by the union of the Assabet and the Sudbury Rivers at a point, as the crow flies, some twelve or thirteen miles from Whipple's Falls. On January 21, 1875, the city of Boston, acting under the St. of 1872, c. 177, filed a taking of the waters of the Sudbury at a point in Framingham some twelve and a half miles in a direct line from the head of the Concord, and about twenty-five miles in a direct line fron Whipple's Falls. The city was prohibited from reducing the water below a height sufficient to maintain a running stream flowing at least one and one half million gallons a day. The volume which it may divert is equal to one fifth of the volume which would flow in the Concord at Whipple's Falls, if no water were diverted from the Sudbury. All of the then proprietors of the mills now owned by the respondents in the partition suit applied for damages for this taking. During the proceedings the Wamesit Power Company, on December 1, 1875, conveyed to the city " the amount of water which may flow in their said canal, equal to the aliquot part of sixty-six (66) cubic feet of water per second whenever the water is below the level of the permanent stone dam of said company, said aliquot part being that which will flow in and through said canal when the water is below the top

of said permanent stone dam, being sixty-six two hundred and eighty-eighth parts ($\frac{66}{288}$) of said water then and there flowing, to be drawn by the city of Boston or their assigns, as each may choose to do, through any of the penstocks or flumes of any of the proprietors of water who have now a right to draw the same from said canal other than said Wamesit Power Company, through which said city or its assigns may elect to have said water drawn, whether through one or more of said flumes or penstocks. This right to draw water by said city or its assigns to be exercised only for eleven and one fourth (11¼) hours per day for six (6) days in each week, forever, but not more or otherwise." On October 16, 1876, the city offered to convey to each of the respondents, in mitigation of damages, or in compensation for any water taken, an amount of water in the river, to flow through the raceways and penstocks of each, equal to the entire flow of the Sudbury River to which they were entitled under their several deeds. The offer was not accepted, and damages were awarded and compensation paid to each of the respondents for the taking. On February 23, 1883, the city of Boston released to the Wamesit Power Company all its right, title, and interest in and to the water and water rights conveyed in the deed of December 1, 1875.

Whipple held the title to the dam and the canal until March 20, 1863, when he conveyed to one Patch, who gave him a mortgage back, and who held the equity until he conveyed it to Mr. Butler by a deed dated February 15, 1865. In a deed dated May 18, 1857, of a mill site, now the Sterling Mills, Whipple expressly covenanted to enlarge the canal within seven months from that date, so that it should be of sufficient capacity to carry and deliver not less than 288 cubic feet per second. On August 21, 1862, in a deed of a mill site, now the Lowell Bleachery, he also covenanted to enlarge the canal to the same capacity within six months from that date; and on February 20, 1863, in a deed of a mill site, now part of the Chase Mills, he also covenanted to enlarge the canal to the same capacity within seven months from that date. The conveyance of March 20, 1863, from Whipple to Patch, was made subject to the provision that the grantee should enlarge the canal to the same capacity when needed. In a deed of October 5, 1863, of the mill site, now the Faulkner

Mills, Patch covenanted within seven months from that date to enlarge the canal to the same capacity; and on February 28, 1864, in a deed of a mill site, now part of the Chase Mills, covenanted to enlarge the canal to the same capacity within seven months from that date.   The deed of Patch to Mr. Butler, of February 15, 1865, recited that it was made subject to the obligation to enlarge the canal to the same capacity when needed, and also that Mr. Butler assumes to pay the mortgage to Whipple, and to hold Patch personally discharged thereof.   Whipple had transferred to Mr. Butler this mortgage of March 20, 1863, by an assignment dated February 10, 1865, and recorded February 15, 1865; and Mr. Butler, by an assignment dated February 14, 1865, transferred it to one Hildreth, who, on November 3, 1871, made an entry *in pais* to foreclose, and on December 25, 1872, reassigned the mortgage to Mr. Butler.   The assignment from Mr. Butler to Hildreth, while dated February 14, 1865, was acknowledged on February 15, 1865, and recorded on November 6, 1871, the deed from Patch to Mr. Butler being dated and acknowledged on February 16, 1865.   Neither Whipple, Patch, Mr. Butler, nor the Wamesit Power Company has enlarged the canal, and it is not of sufficient capacity to carry and deliver 288 cubic feet of water per second when the water is as high as the permanent dam.

When the deeds under which the respondents hold their privileges were made by the proprietors of the dam and canal, the grantors were themselves using a portion of the water power. In each of the deeds is a grant of " the right forever hereafter to have said canal and the banks thereof, and the permanent dam owned by the grantor across Concord River, continued for the purpose of affording a water power, and to the extent and with the exceptions and reservations hereinafter contained," save that in the deed of 1862 to the Lowell Bleachery the grant is " for the purpose of affording water for any and all purposes, and a water power."

There are also covenants to forever " keep and maintain in suitable and proper condition and repair the said canal, enlarged to the capacity aforesaid, and the banks and parts and appurtenances thereof; also the said permanent dam and the eight-inch flashboards as they are usually kept thereon, subject to such

reasonable and temporary interruptions and hindrances as may be necessary in such maintenance and repairs." In none of the deeds is there any express stipulation that the owner of the dam and canal shall not use the water at any time or in any way.

The partition suit was commenced on April 10, 1882. In it the plaintiffs contend that the several respondents are entitled to less water than the amount granted in the deeds under which they hold their respective privileges, because of the taking of the water of the Sudbury River by the city of Boston, and the adjustment and payment to them by the city of their damages, and that each respondent has thus sold or parted with one fifth of the water granted; the respondents deny this position, and ask that the Wamesit Power Company be ordered to enlarge the canal to the capacity agreed upon, and contend that until the canal is so enlarged that company's use of the water should be limited, so that as far as practicable the respondents may each receive as much water as if the canal were so enlarged. They also contend that they are entitled to the benefit of the storage capacity of the pond, and to restrain the Wamesit Power Company from using water outside of usual working hours, if necessary to secure the flow of the full 288 cubic feet during those hours.

At the hearing before the single justice an interlocutory decree was entered, directing an hydraulic engineer to devise and set in operation proper appliances to measure to the parties their respective quantities of water per second, whenever the canal carries 288 cubic feet per second, and their respective proportional amounts whenever the canal does not deliver that amount, any surplus over the 288 cubic feet per second to go to the Wamesit Power Company; and also to ascertain the quantity of water which will run through the canal when the water is at the top of the permanent dam, and at the top of the flashboards, and what widening or deepening of the canal, if any, will be required to give it a capacity to carry and discharge 288 cubic feet of water per second, when the water in the river is as high as the top of the permanent dam, without the water therein at the head of the head raceways of any of the grantees being drawn down more than six inches below the top of the permanent dam. This decree also enjoins the Wamesit Power

Company from drawing any water otherwise than by drawing its $\frac{66}{288}$ parts during eleven and a quarter hours per day for six days in the week, whenever the water is not running to waste over the dam or the flashboards, until further order of the court, the case being retained with liberty to apply for further orders.

The engineer reported that the canal was not of sufficient capacity to carry and discharge the 288 cubic feet of water per second. He devised and set in operation a plan and appliances for dividing the water, which are approved by all parties.

At the hearing for a further decree, the question was raised as to the amount of water to which each party was entitled, and the respondents contended that they were entitled to the storage capacity of the pond; that the Wamesit Power Company should be ordered to enlarge the canal; that they were entitled to the same part of all the water flowing in the river as they were before the taking by the city of Boston; and that the Wamesit Power Company was bound to pay all the expenses of the engineer and the future expenses of measurements of water. All these questions were reserved for the determination of the full court, and also the whole case upon the report, the evidence of the engineer, the exhibits, and the facts found.

The second bill was brought on July 21, 1882, by Luther W. Faulkner, as owner of the right to draw 25 cubic feet of water per second under his deeds from Patch of October 5, 1863, and of May 11, 1864. The respondent in that bill is the Wamesit Power Company alone. The bill asks that that company may be compelled to enlarge the canal, and that it may be prevented from so using the water for more than eleven and one quarter hours per day as to reduce the water in the canal during those hours to less than 288 cubic feet per second. This case is reported for the consideration of the full court, without a decree, upon bill, answer, and certain exhibits. The exhibits are the deeds in the titles of the respective parties, the statements of the hydraulic engineer in his report in the partition case, and the testimony of two witnesses, D. W. C. Farrington and Frederick Faulkner. Farrington testified, in substance, that he had been connected with the Wamesit Power Company for more than twenty years, commencing within a year or two after its purchase, and that he had since had entire charge of the water

power and of the distribution of the water; that Faulkner during the same period had many times applied to him to use the water at night; that he permitted him to use it, and that he paid for it without ever making any objection to paying for it; that they had never claimed, to his knowledge, that the Wamesit Power Company did not have the right to sell or use the water; that that company had used the water at night without objection on the part of any one, although it was known that its mills were running at night; that the Sterling Mills had many times, covering considerable space of time, paid them for water to run nights; that the Chase people had done the same thing, and that no other parties on the canal have ever made objection to the Wamesit Mills running nights; that no one ever asked him to widen the canal; that some years ago the Wamesit Company attempted to widen the canal for a supply to its own mill, but he never had any other authority or direction except to bring the water for their use; that while he was widening the canal the Lowell Bleachery Company forbade his doing it, but that he did not stop; that when the Bleachery began to build a canal to take the water from the Wamesit Power Company to their own limit, they had a flume smaller than the Wamesit canal, and had never widened it; and that it had been collapsed for more than fifteen years; and that he never had any conversation in reference to widening the canal with either of the Faulkners.   Frederick Faulkner's testimony was, in substance, that, under instructions from his father, Luther W. Faulkner, some twenty-two or twenty-three-years ago, he had asked the agent of the water company to dig out the canal and enlarge it according to the deed; that since that time he had never known of anybody having been formally asked to widen the canal; but that it had been talked of, and brought up in conversation with Farrington.

It will be noticed that, while the Wamesit Power Company at the commencement of the partition suit was in possession of the dam and the canal, and of the other property mentioned in the deed from Mr. Butler to that company of February 10, 1866, on the face of the papers the mortgage given by Patch to Whipple on March 20, 1863, appears to have been assigned by Whipple to Mr. Butler on February 10, 1863, and by Mr. Butler to Hildreth, on February 14, 1865.   The deed of the equity to

Mr. Butler bears date, and appears to have been acknowledged, on the following day, February 15, 1865. But the deed from Patch to Mr. Butler contains in the covenant against encumbrances these words relating to the mortgage, " except a mortgage to Oliver M. Whipple, which said Butler assumes to pay, and to hold the grantor [Patch] personally discharged thereof " ; and, by accepting the deed, Mr. Butler contracted to pay off and discharge the mortgage. When, therefore, the mortgage was reassigned to him on December 25, 1872, it would seem to have been his duty to discharge it in performance of this implied contract with Patch, made by his acceptance of the deed of February 15, 1865. See *Rice* v. *Sanders,* 152 Mass. 108. If so, Mr. Butler may have in equity no right to assert a paramount title under that mortgage; but he is not a party to these proceedings, and we cannot, in such a manner as to conclude him, say that it was so. The deed of Patch to Mr. Butler conveyed only the equity, and apparently Hildreth held the mortgage when Mr. Butler conveyed to the Wamesit Company; although his implied agreement may seem to show that he is estopped to set up the mortgage against the Wamesit Company, this cannot be settled in a case in which he is not a party, and has not been heard.

It will also be noticed that the Wamesit Power Company conveyed to the city of Boston, on December 1, 1875, by a deed ratified by Mr. Butler, a right of $\frac{66}{288}$ parts of water in the canal whenever its level is below the top of the dam; and that the reconveyance from the city was not made until February 23, 1883, some months after the commencement of the partition suit. None of the parties, however, have contended that the city of Boston ought to have been made a party, and, as the Wamesit Power Company and the American Bolt Company, the complainants in the partition suit, were both interested in the water power which they ask to have partitioned, we see no difficulty in entertaining the bill, so far as to divide the water power between the parties, nor, as incident to this division, in deciding the questions as to the effect of the taking of the waters of the Sudbury River by the city of Boston, and of the right of the mill-owners to have the use of the pond as a reservoir. There are at present difficulties in the way of deciding whether the Wamesit Power Company is under obligation to enlarge the

canal. It is evident that not only all the parties to the partition suit are interested in this question, but that, if Mr. Butler has any rights under the Patch-Whipple mortgage, he is also an interested party. The present owners of any portion of the land which was owned by Whipple or by Patch at the time when either made a conveyance from which springs a present right to have the canal enlarged, may also be interested in the determination of this question; because it may be that their lands, as well as those of the Wamesit Power Company, were charged with the obligation to make the enlargement. Under such circumstances we do not feel justified in deciding in the partition suit the question raised by the answers in that suit, as to the obligation of the Wamesit Company to make such an enlargement. The decision of that question is more than an incident to the partition, and can be satisfactorily dealt with only in some proceeding in which all parties interested can be heard, and in which all considerations bearing upon the subject can be brought before the court. See *Worthington* v. *Waring*, 157 Mass. 421. Nor can we decide this question in the suit of Faulkner against the Wamesit Power Company in its present condition, because in that case we have now before us only two of the necessary parties. If the complainant in that action shall see fit so to amend it as to bring in all parties interested in the determination of the question of the right of the plaintiff to have the canal enlarged, the amendment will be allowed; and if, in that case, it shall be finally determined that any of the parties in the partition suit must enlarge the canal, such changes as may be equitable may then be made in the decree in the partition suit, the case being retained for that purpose. We propose, therefore, to divide the water power between the plaintiffs and the respondents in the partition suit without regard to the question whether the Wamesit Power Company is under obligation to enlarge the canal, disposing also of the other questions raised, namely, the effect of the Sudbury River transaction, and the contention that the respondents are entitled to the use of the pond as a reservoir.

The taking of the water of the Sudbury at Framingham had no effect to qualify or diminish the rights of the respondents to any water which comes in the Concord River to the pond. The

city of Boston did not assume or have the right to take water in Lowell; its action in taking the water of the Sudbury at Framingham undoubtedly lessened the flow of water at Lowell, and so gave the respondents a valid claim for damages, but did not otherwise affect them. The legal measure and quality of their rights in the actual flow remained the same. So far as their easements in the dam and canal at Whipple's Falls are concerned, the transaction between the city and the mill-owners has not affected or altered the respective rights and obligations of the dominant or the servient lands. The water of the Sudbury which passes the point at which it may be diverted is in no way affected. All the water which flows in the Concord River at Lowell is water to which the rights of the mill-owners attach under their deeds, whether it has passed the point in Framingham at which the city may divert the water of the Sudbury, or comes from the Assabet, or from any other tributary of the Concord. The rights and obligations of the parties with reference to the mill privileges at Lowell are no more affected or varied by the action of the city than if the volume of the Sudbury in Framingham had been diminished by local drought, or by the clearing of forests or reclaiming of swamps. To hold otherwise would be to say that the deed of the right to draw a specific number of cubic feet of water per second from the Concord at Lowell was to be construed as a grant to draw one fifth of that number of cubic feet of Sudbury River water, and only four fifths of the same number of cubic feet of all other water in the Concord, and that when, from any cause, the proportion of Sudbury water in the Concord fell short, the right to take water from the canal must proportionally abate, however great the actual supply. If any part of the Sudbury River transaction could affect the rights of these parties *inter sese*, it was the statute taking, and not the payment or receipt of the compensation for the consequent injury, and the taking had the same effect upon all parties concerned at Whipple's Falls, — upon both the plaintiffs and the respondents; that is to say, it affected the value of their estates, but not their nature or limitation. The parties who sold and purchased these lands and water rights knew that the Concord River was a factor to be affected by many causes liable to swell or to diminish its vol-

ume, and which might affect its flow by operating upon the river itself, or upon its tributaries.   They granted and took water privileges or rights in the volume or flow of the Concord River at the dam.   They knew that running water in a natural stream, like the unconfined air, is the permanent property of no one, and cannot by any person be impressed with a special quality to be retained after it has passed from his dominion and is again part of a running stream.   When in these deeds the parties dealt with the water of the Concord River at Lowell, they did not deal with it as with a cable of five strands, one of which, above the point at which they became the cable, had a separate existence, as the Sudbury River, for instance, and which, as the subject of their deeds, retained its individuality until it passed below Whipple's Falls.   They dealt with the water of the Concord River, and not with that of the Sudbury, and the water of the Concord at Lowell is no longer the water of the° Sudbury, although operations which affect the volume of the Sudbury may affect the volume of the Concord.   If the quantity of water to which the mills were entitled, and which the servient land was bound to allow them, had been made to vary with the volume of the Sudbury, instead of with that of the Concord, the question would have been different; but the rights of the parties under these deeds cannot be so construed.   There is no ground for the contention that the respondents have sold one fifth of their right to draw water from the canal at Whipple's Falls.   The transaction was wholly different, and the water rights to be now partitioned were not affected in nature or in quality, but simply in value, by the taking of the water of the Sudbury and the payment of compensation therefor.

The mills established under the grants made by Whipple and by Patch are entitled to the benefit of the storage capacity of the pond.   When the grants were made, eleven and one quarter hours a day for week days were the usual working hours during which mills of the character established on these privileges were operated.   The dam had a pond above it capable of use as a reservoir if not constantly drawn upon; and if drawn from only on week days and in working hours, it would, when the river was low, enable the mills to receive their maximum supply on more days than if continuously drawn upon and not used as

a reservoir.   In this climate there are to be regularly expected
seasons when the flow of water is less than the average.   This
was known to the parties, and the deeds must be read in con-
nection with the situation.   The expression in the restricting ·
clause, declaring that if at any time the water in the canal shall
not equal two hundred and eighty-eight cubic feet per second,
" during the time aforesaid," that is, during the eleven and one
quarter hours per day for six days in the week, then the right
should be to take only a proportional part of the actual flow,
indicates that the grant is not merely of the right of the actual
flow of the working hours, but is a right to the flow of the water
to be stored in the pond during the other hours of each day and
on Sunday.   For the words " during the time aforesaid " would
be unnecessary upon the other theory of the grant.   They imply
that the flow during working hours shall be increased by storage
to the extent of the capacity of the pond during intervals of
non-use.   The covenant to keep flashboards points to the same
conclusion ; it would be of little or no advantage if the mills had
no right to have the water stored, or if the owner of the dam
could draw down the water in the pond at will.   The use of
flashboards implies a supply of such a nature as to make hus-
banding by artificial storage a necessity.   The practice of closing
gates, except during usual working hours, for the purpose of
allowing mill ponds to fill, is customary and legal; *Springfield*
v. *Harris*, 4 Allen, 494; *Whitney* v. *Wheeler Cotton Mills*, 151
Mass. 396, 403 ; and must have been in the minds of the parties
in making the grants.   The use of the pond for storage, so far
as necessary to give full operation to the grants, was therefore
implied in and was conveyed by them.   Evidence that the mill-
owners have purchased the right from time to time to draw water
at extra hours, and that they have never objected to the practice
of the Wamesit Power Company of drawing water at night, and
never claimed that it did not have the right to draw water at
its own pleasure, is of but slight significance as bearing on this
question.   Whether the mill-owners had a right to have the
water stored or not, they could not draw it, except during the
usual working hours, without obtaining privileges outside of their
grants.   The use of water out of hours by the Wamesit Power
Company may have been at times of high water, and the circum-

stances of its use such as to call for no protest from the owners of the other mills.

We consider it equitable that the expenses of dividing the water should be borne by all the parties interested, in proportion to the extent of their respective interests as nearly as may be. If the cost of the apparatus devised and erected by the hydraulic engineer, and of its operation up to the present time, and the amount of the engineer's compensation, are divided in proportion to the amount of water which each party is entitled to take when the whole flow is 288 cubic feet per second, substantial justice will be done.

In the partition suit, a decree may be entered declaring that the respective parties are entitled to draw water from the pond and canal at Whipple's Falls, as follows: That when the state of water in the river is such that the canal will carry 288 cubic feet per second, or more, the Faulkner Mills may draw 25 cubic feet per second during eleven and one quarter hours per day of six days in the week; the Chase Mills, 48 cubic feet; the Sterling Mills, 36 cubic feet; the American Bolt Company, 36 cubic feet; the Belvidere Mills, 27 cubic feet; the Wood Mill, 12 cubic feet; the Lowell Bleachery, 36 cubic feet; the Wamesit Power Company, 68 cubic feet, and any surplus above 288 cubic feet per second. That when the state of water in the river is such that less than 288 cubic feet per second flow in the canal, each of the parties shall draw its proportional part only of the actual flow. That the Wamesit Power Company is perpetually enjoined and restrained from drawing any water from the canal otherwise than by drawing its $\frac{68}{288}$ parts, and any surplus over the 288 cubic feet during eleven and one quarter hours per day for six days in the week, whenever the water is not running to waste over the dam and flashboards. That a scheme for the use of the appliances devised by the hydraulic engineer for dividing the water in accordance with this decree, if not agreed upon by the parties, be settled by a master to be appointed upon request. That the cause be retained, with liberty to either party, upon the determination of the question of the obligation to enlarge the canal, to apply for such modification of this decree as may be equitable, and for any further orders necessary to make the partition firm and effectual. And the decree is to be without prejudice to such

rights of either party to the cause as may be involved in the question of the right or obligation to enlarge the canal.

In the suit of Faulkner against the Wamesit Power Company, amendments may be made striking out all claims except to the enlargement of the canal, and bringing in as parties all persons or corporations interested in the decision of that question. If such amendments shall not be made, that bill will be dismissed without costs and without prejudice.

*So ordered.*