GEORGE A. STEVENS *vs.* CITY OF WORCESTER.

SAME *vs.* SAME.

Worcester.    May 13, 1907. — June 18, 1907.

Present : KNOWLTON, C. J., MORTON, HAMMOND, LORING, & BRALEY, JJ.

*Mill Privilege.    Water Rights.    Sewer.    Worcester.    Damages,* For injury to
mill privilege, Mitigation.  *Blackstone Canal Company.    North Pond.    Statute.
Evidence,* Opinion: experts, To refresh recollection.  *Witness.*

Acting under St. 1867, c. 106, which empowered the city of Worcester to use and
    appropriate Mill Brook, among other waterways, for the purposes of a sewer
    system, that city passed various votes for the purpose of adapting the brook
    to use as the trunk sewer of its system, among them a vote changing the place
    of its outlet to a designated point on Blackstone River below the natural outlet.
    *Held,* that such votes gave the city no right to divert water, which naturally would
    flow by a mill which was below the point designated as the new outlet of the
    brook, so that it would not flow by the mill, and gave the owner of such mill
    no right of action for an anticipated injury to his mill privilege.
Intending to act under St. 1886, c. 331, which provided that the city of Worcester
    should remove the offensive and polluting properties from the sewage it was dis-
    charging into Blackstone River and should have power to take lands, water rights
    and water privileges for that purpose, and required that the city should record
    in the registry of deeds a description of the properties taken and pay damages
    therefor, that city diverted Mill Brook, which it was using as the main trunk
    sewer of its sewer system, and which was discharging into Blackstone River
    above a certain mill, so as to cause its waters to flow to a purifying plant and
    then to return to the river below the mill, but recorded no taking of the mill
    privilege in the registry of deeds.  In an action of tort by the owner of the
    mill against the city, it was *held,* that the diversion of the water from the plain-
    tiff's mill was unauthorized and that he might recover damages resulting
    therefrom.
At the trial of an action of tort against the city of Worcester for diverting the
    waters of Mill Brook, which was used by the city as the main trunk sewer of its
    sewer system and naturally flowed into Blackstone River above a mill of the
    plaintiff, so that they flowed into the river below the mill, it appeared that the
    water diverted included, besides the natural flow of the brook, the water drawn
    from the city's public water supply and returned into the sewers as sewage from
    the entire city.  *Held,* that the defendant was not liable for the diversion of
    the water thus added to the natural flow of the brook from the public water
    supply.
At the trial of an action of tort against the city of Worcester for diverting the
    waters of Mill Brook, which was used by the city as the main trunk sewer of its
    sewer system and naturally flowed into Blackstone River above a mill of the
    plaintiff, so that they flowed into the river below the mill, it appeared that the

water diverted included, besides the natural flow of the brook, storm and surface water from the settled portion of the city collected by street gutters and catch basins, in which was some water not naturally tributary to Mill Brook but to other streams which naturally flowed into Blackstone River above the plaintiff's mill. *Held*, that, although this yield from the urban area may have increased the natural flow of the brook, such increase was an incident to the change in the use of the land, and the plaintiff could recover for damage to him resulting from the diversion of such water.

At the trial of an action of tort against the city of Worcester for diverting the waters of Mill Brook, which was used by the city as the main trunk sewer of its sewer system and naturally flowed into Blackstone River above a mill of the plaintiff, so that they flowed into the river below the mill, it appeared that the waters diverted included, besides the natural flow of the brook, water, in quantity too small to be estimated, which had leaked into the sewer system from the pipes of the public water system. *Held*, that, because its quantity was so small that it could not be estimated, no deduction should be made on account of such water from the damages resulting to the plaintiff from the wrongful diversion.

At the trial of an action of tort against the city of Worcester for diverting the waters of Mill Brook, which was used by the city as the main trunk sewer of its sewer system and naturally flowed into Blackstone River above a mill of the plaintiff, so that they flowed into the river below the mill, it appeared that some of the waters legally taken by the city for use in its water works system leaked from the reservoirs of the defendant's water works system, and flowed into the river above the mill of the plaintiff. The defendant sought allowance in the nature of set-off for the consequent increase in the amount of water which the plaintiff might use. *Held*, that no allowance should be made for water which the city could have used but allowed to be wasted.

At the trial of an action of tort against the city of Worcester for diverting the waters of Mill Brook, which naturally flowed into Blackstone River at a point above a mill of the plaintiff, it appeared that the Blackstone Canal Company, acting under St. 1822, c. 27, constructed dams so that it might use for canal purposes the waters of North Pond which naturally flowed into Mill Brook, and built a canal along the brook and Blackstone River, constructing feeders to it from the brook and the river both above and below the mill of the plaintiff. It made · no specific taking of the right to divert any of the waters that came to the plaintiff's mill. The canal subsequently was abandoned and, under St. 1844, c. 166, the company conveyed all of such water rights and water privileges as it owned to persons some of whom conveyed to the defendant. *Held*, that the defendant gained, through such conveyances, no right to divert any water to the detriment of the plaintiff.

At the trial of an action of tort against a city for wrongfully diverting water naturally flowing by a mill of the plaintiff, the superintendent of the defendant's sewer system was summoned as a witness for the plaintiff and asked to express an opinion as to subjects material to the issue being tried. It appeared that he had an opinion, but that, in order to express it, he would have to consult certain memoranda compiled by him in the scope of his employment, and that these memoranda were in reach of his hand. *Held*, that it rightly was ruled that the witness could be required to consult the memoranda already compiled and at hand, and then to express his opinion.

*It seems* that a witness qualified as an expert as to a certain subject may be required to express an opinion regarding such subject if he has one, but cannot be required to perform labor in order to qualify him to do so.

TWO ACTIONS OF TORT.  Writs in the Superior Court for the county of Worcester dated October 7, 1891, and December 3, 1897.

The first action is to recover damages which the plaintiff, the owner of a mill privilege on Blackstone River a short distance below the confluence of Mill Brook and Middle River, which unite to form Blackstone River, suffered by reason of a diversion of the waters of Mill Brook by the defendant in June, 1890 ; and the second action is for damages resulting from such diversion between December 4, 1891, and the date of the second writ.

The two cases were referred to an auditor and tried together before him.  At a trial before *Gaskill*, J., without a jury, on the coming in of the auditor's report, the only evidence being the report, the presiding judge made *pro forma* findings of fact and rulings of law in accordance with those of the auditor, and, at the request of the parties, reported the cases on the pleadings and the auditor's report for consideration and determination by this court.

There were six votes and orders of the city council of Worcester previous to March 8, 1880, which are mentioned in the third paragraph of the opinion.  Each of these provided for the changes necessary to adapt Mill Brook to the uses of the sewer system of the city of Worcester in accordance with the provisions of St. 1867, c. 106.  None of them assumed to lessen the amount of water flowing into Blackstone River from Mill Brook.  The vote of March 8, 1880, referred to in the opinion, changed the place where Mill Brook was emptied into Blackstone River from its natural channel to a point farther down stream, but still above the plaintiff's mill, and did not lessen the amount of water coming to the plaintiff's mill.  The channel as thus changed became the main trunk sewer of the sewer system of the city of Worcester, and into it, and, through it, into Blackstone River above the plaintiff's mill, there were discharged (1) the entire sewage from the sewer system of the city of Worcester (being the water drawn from its public water supply and returned in part into the sewers, carrying with it the sewage from the buildings in the city) ; (2) the storm and surface water from the settled portion of the city (hereinafter designated as the " urban area ") collected by street gutters and catch basins and thence taken into the

sewer system (herein is included some water which was not naturally tributary to Mill Brook, but was tributary to other streams, the waters of which in a state of nature were tributary to Blackstone River above the plaintiff's mill) ; (3) ground water (being that part of the water falling on the urban area or leaking from the city's water pipes which soaked into the ground and thence found its way into the sewer system through the pipe joints), and (4) the entire natural drainage of the watershed tributary to that part of Mill Brook which had not been appropriated as a sewer. All of this water was diverted by the defendant, purporting to act under St. 1886, c. 331, as stated in the opinion, and caused to flow into Blackstone River below instead of above the plaintiff's mill.

The auditor found that the water drawn from the city's reservoirs through the pipes of its waterworks system and discharged into Mill Brook (which is classified first above) was not a part of any water theretofore taken from that stream, but was entirely water which naturally was not tributary to Mill Brook itself. All of it was, however, tributary to streams which were themselves tributary to Blackstone River and all of it entered Blackstone River above the plaintiff's mill. Prior to the acts complained of, the city had legally taken the waters of Lynde, Tatnuck and Kettle Brooks for its water supply and, after the use of such waters, had received them into its sewer system, whence they were discharged into Mill Brook.

Of the water reaching Mill Brook from the urban area (classified second above), the auditor found that about four fifths was surface and storm water from territory that was naturally tributary to Mill Brook, which would naturally have found its way into Mill Brook and come to the plaintiff's mill. The grading and paving of the streets, the construction and maintenance of street gutters and catch basins and the providing of sewers did not, so far as this four fifths of the yield of the urban area was concerned, bring water which otherwise would have gone elsewhere, but merely facilitated its passage to its natural channel and perhaps slightly increased it in amount. The other one fifth was water falling on territory not tributary to Mill Brook. It was, however, tributary to streams of water which would naturally come to Blackstone River and the plaintiff's mill. The acts of

the city resulted merely in transferring this flow from one tributary of Blackstone River to another.

The water classified third above the auditor found to consist of such part of the rainfall as soaked into the ground and found its way into the sewers through the joints of the sewer pipes, and of leakage from the city's water pipes which percolated into the ground and likewise passed into the sewers through the joints of the pipes. The amount of leakage from the city's pipes which found its way into the city's sewers he found impossible to determine or estimate, "it being so small as to be a negligible quantity in the present problem."

By St. 1822, c. 27, the Blackstone Canal Company was incorporated and was authorized to "locate, construct and fully complete a navigable canal between" certain termini with "full power to employ and use as reservoirs for the purpose of supplying with water said canal or such works as may have any portion of their waters diverted from them to supply said canal, North Pond . . . in the northerly part of Worcester . . . and also to save the flood and other waters in said ponds and to construct artificial reservoirs for the purposes aforesaid," and to "connect with said canal by feeders or by navigable canals any or all of said ponds and reservoirs." Provision was made as to payment of damages to persons injured.

North Pond is a great pond, the waters of which in their natural state flowed into Mill Brook.

Proceeding under the power given by the Legislature, the canal company constructed dams for the purpose of saving the flood and other waters of North Pond, among others, and a due assessment of damages on petition duly filed was made to parties injured. The route of the canal was laid out along the line of Mill Brook and Blackstone River. At points above and below what is now the plaintiff's mill feeders were constructed from the river to the canal. The company made no specific taking of the right to divert from their channel the waters of Mill Brook or of Blackstone River. Such right of diversion as it required was what resulted from the location above set forth and by the construction of feeders and works which did divert from Mill Brook and Blackstone River such part of their waters as the works constructed were capable of diverting. These works,

however, did not divert the entire flow of either or both of these streams and there was no evidence to show to what extent the water was diverted. After the canal was opened and operated, the brook and the river continued to exist as independent streams, and after the canal was abandoned the river and brook flowed as formerly in their ancient channels.

The canal company, under authority of St. 1844, c. 166, sold all its rights in the canal, dams, rights of way and " all other privileges and appurtenances . . . however the same may have been acquired by " it to persons, the interests of part of whom were ultimately conveyed to the defendant.

With regard to the witness Eddy, mentioned in the opinion, the auditor reported that he was the superintendent of sewers of the defendant, and was called as a witness by the plaintiff and examined at length about various matters of fact and of opinion. It was admitted that he was exceptionally well qualified to express an opinion upon the matters which were the subjects of inquiry. During his direct examination he was asked as to his estimate or opinion as to the amount of sewage and surface or freshet water discharged into Mill Brook month by month during the time covered by these actions. The subject matter of the inquiry was material and the witness had given his estimate or opinion of the average daily flow of sewage for the month of June, 1890, from the sewers into Mill Brook. Being then asked as to the elements upon which that opinion was based, it transpired that such opinion was based primarily upon the amount of city water drawn from the city's reservoirs, that the figures showing this draft were tabulated but had been furnished to him by some one in the city engineer's office. He then was asked for a table containing those figures and procured it. On his being asked to give the tabulated figures, the defendant objected on the ground that the figures asked for and the opinion formed and the computations made by him were made solely for the use of the defendant. The witness himself had no objection to replying. The auditor ruled that the witness could be required to express an opinion, if he had one, but that he could not be compelled to study the case or perform labor in order to qualify him to express an opinion.

Upon further inquiry, witness testified that he had formed an

opinion as to the amount of sewage delivered into the system of Mill Brook, that he had had that opinion a short time before when he last consulted his tables, that this opinion was expressed in figures and tabulated and that by consulting these tables (which were within reach of his hand) he could state that opinion, otherwise he could not.  He then was asked to consult the tabulated figures for the purpose of stating the opinion he had formed, but declined to do so unless ordered.   The defendant objected that the witness should not be required so to refresh his recollection.  The auditor ruled that the witness, being upon the stand and qualified to express an opinion upon the subject matter of the inquiry, could be required to express it if he had formed one, and that if the witness had formed an opinion which he had committed to paper, he must refresh his recollection and state that opinion if the means were at hand.  The witness thereupon. consulted his memoranda and gave the information desired, and the defendant excepted.

The auditor ruled that the plaintiff could recover damages suffered by him for the diversion by the defendant of waters which otherwise would naturally flow down Blackstone River to his mill, refusing to allow him damages resulting from the diversion of waters described as first in the classification on page 47, but allowing damages resulting from the diversion of those classified as second, third and fourth, and refused to make any deduction from the damages awarded for diversion of water of the third class although some of it had leaked from pipes of the defendant's waterworks system, the amount of such water being too small to calculate.  He further ruled that the defendant in no way gained any right to divert the waters that would naturally flow past the plaintiff's mill from North Pond.

Other facts are stated in the opinion.

The case was submitted on briefs.

*E. H. Vaughan & C. M. Rice*, for the plaintiff.

*E. I. Morgan & J. F. Humes*, for the defendant.

KNOWLTON, C. J.   These are two actions of tort to recover damages for the diversion of water from the plaintiff's mill. Acting under St. 1867, c. 106, which authorized the city council of Worcester to fix the boundaries of Mill Brook and other streams, and to alter, change, widen, straighten and deepen its

channels, to appropriate and cover, pave and enclose them in retaining walls, so far as they should judge necessary for the purposes of sewerage, drainage and the public health, and to take and hold, by purchase or otherwise, lands, water rights, dams or other real estate, the city, at different times, has made changes in Mill Brook, and has appropriated different parts of it to use as a sewer, until now, from a point considerably northward of the centre of the city to the point where it flows into the Blackstone River, the whole stream is appropriated to this use.

The plaintiff owns a mill on the westerly bank of the Blackstone River, below the place where Mill Brook flows in, and, for a long time prior to the acts complained of in these suits, this mill had been run by water power furnished by this river. To carry out the command of the Legislature contained in St. 1886, c. 331, to purify the sewage which it was discharging into the Blackstone River, the defendant built an outflow sewer extending from Mill Brook, at a point above its junction with the Blackstone River, to the purification works which it constructed. From June 25, 1890, to the date of the second of these writs, the city has been all the time diverting from Mill Brook water, bearing sewage, and conducting it to the purification works, and thence discharging the purified liquid into the Blackstone River at a point below the plaintiff's mill, so that the plaintiff has lost the use of this water. He claims damages for this diversion.

By no one of the several votes and orders of the city council relating to Mill Brook, prior to March 8, 1880, did the city assume to take or divert its waters from any riparian proprietor below the point to which the last of the changes referred to extends. By these votes, and the action under them, the city acquired no right to divert any part of the water from the plaintiff's mill. The right of the plaintiff to recover damages, under the statute, for the rights acquired by the city, was therefore limited to loss from the pollution of the water and other similar causes, and did not include damage for any diversion of the stream from his mill. This is settled by *Washburn & Moen Manuf. Co.* v. *Worcester,* 153 Mass. 494. There is nothing at variance with this statement in the case of *Worcester Gas Light Co.* v. *County Commissioners,* 138 Mass. 289, in which it appears that Piedmont Brook had been taken by the city for the pur-

poses for which it was subsequently used, more than two years before the time when the petitioner filed its petition for the assessment of damages. This use involved a diversion of the water from the petitioner's estate. The petition in that case, therefore, came too late.

The defendant contends that the vote of March 8, 1880, gave it a right to divert the water from the plaintiff's mill; but the rights taken under this vote extended down the stream only to the point where the waters were to be discharged into the Blackstone River at the terminus of the "common sewer which extends from Cambridge Street to a point on the Blackstone River, about fifty feet below the stone bridge over said river, on Millbury Street, near the works of the Washburn and Moen Manufacturing Company." This point is above the plaintiff's mill, and the vote gave the city no right to divert the water from the river below, into which the brook was accustomed to flow, and gave the plaintiff no right to damage for an anticipated diversion of water from his mill.

The St. 1886, c. 331, under which the outflow sewer was constructed, required the city to remove the sewage from the water; but it did not give a right to take property without compensation. It authorized the taking of "lands, water rights, water privileges, rights of way or easements . . . necessary for the establishment of such system of sewage disposal," and compelled the payment of damages for all property so taken. A description of property taken was to be filed and recorded in the registry of deeds. The city did not assume to take any water rights under this statute, nor did it file any certificate in the registry of deeds. The diversion of water from the plaintiff's mill was, therefore, unauthorized.

The decisions in *Harrington* v. *Worcester*, 186 Mass. 594, and *Rome* v. *Worcester*, 188 Mass. 307, do not relieve the defendant from liability for this diversion of water. The first of these cases merely holds that an agency of the government, charged with the performance of a governmental duty for the benefit of the general public, is not liable to a personal action, in the absence of a statutory provision, for the negligent omission to do that which the statute requires of it. It does not suggest that a city, in the performance of such a duty, can take the

property of another by the diversion of water from his mill without a liability in damages. The second of these cases rests upon the familiar doctrine stated in *Moynihan* v. *Todd*, 188 Mass. 301, that a city or town, in such a case, is not liable, in an action for negligence, for the misfeasance of its servants or agents while acting in the performance of its public duties.

Numerous questions have been raised as to the assessment of damages. The natural flow of water in the brook is materially increased by water drawn from the city's reservoirs on other streams, through the pipes of the city's aqueduct, and discharged in the form of sewage into Mill Brook. Under the statute cited the city is required to remove the sewage from the water. In our opinion the auditor rightly ruled that, for the diversion from the legally established sewer of so much of the polluted water as entered the sewer in the form of sewage from sources supplied with water by the city's aqueduct, the defendant is not liable. The natural current of the brook is not diminished by taking out the amount of water which is emptied into it as sewage from outside sources. If it might be held that water so entering the stream should be treated as a part of its natural flow, as between riparian proprietors on the river below, we think it ought not to be so treated in a case of this kind, while it is in that part of the brook which was legally appropriated and is maintained by the city as a sewer.

The yield from the urban area — the surface water that finds its way into the sewer from the settled portion of the city — was rightly treated as a part of the water of the brook. If the streets and houses were not there, most of it would pass into the stream. The slight increase in the quantity that comes from the construction of streets and sidewalks is a mere incident to the change in the use of the land, and when it reaches the brook it is a part of the water which may be used by the riparian proprietors.

Upon the findings of the auditor there was no error in holding that the ground water that leaks into the sewers may be disregarded as a separate element in the computation. It appears that the quantity that leaks from the city's water pipes is too small to be worthy of consideration.

The defendant contended that there should be an allowance

in the nature of set-off on account of the fact that water has wasted over the spillways of the city's Lynde Brook reservoir, its Tatnuck Brook reservoir and its Kettle Brook reservoir, which were, severally, parts of its system of aqueducts. All this water flows into the Blackstone River, and the plaintiff has the benefit of it at his mill. The city might retain and use all of it in its aqueducts, if it were necessary or profitable so to do. But it is not practicable for the city, by any reasonable effort, to utilize all of this water at all seasons of the year. Although damages for the original taking of it were computed upon the theory that the city had taken and might use the entire outflow of these brooks, the riparian proprietors below are not chargeable for their use of any that is permitted to run to waste, and to pass through natural watercourses to the sea. *Framingham Water Co.* v. *Old Colony Railroad*, 176 Mass. 404, 411. *Wamesit Power Co.* v. *Sterling Mills*, 158 Mass. 435, 437. The defendant has no better right to charge the plaintiff for the use of this water, by setting off its value against the defendant's liability for the wrongful use of the water of Mill Brook, than it would have to maintain an action of contract against other riparian proprietors for the value of this waste water as an addition to the water power of their mills.

The defendant relies upon its alleged acquisition of rights formerly belonging to the Blackstone Canal Company, granted by the St. 1822, c. 27, and finally disposed of by that company under the authority of the St. 1844, c. 166. The city has a fractional interest in certain property conveyed by the canal company after the discontinuance of the canal. We think it plain that, under these conveyances, the city acquired no right to divert the waters of Mill Brook. The water rights granted by the Legislature to the Blackstone Canal Company were only for the purpose of supplying the canal. The rights conveyed by this company were not rights to interfere with the ordinary flow of the stream, otherwise than by a reasonable use of it after the discontinuance and abandonment of the canal. The vested rights secured to the company and its assigns by the St. 1844, c. 166, after a sale of its property, were only to the dams located to maintain a head of water. There is nothing to show that the purchasers from the canal company acquired a right to divert

any part of the waters of Mill Brook, to the detriment of any riparian proprietor.

The St. 1886, c. 331, gave the defendant no rights in North Pond, nor any other water rights, except as they should be taken under the authority of the act. As none were taken, the city has acquired none under this statute.

The auditor rightly ruled that the witness Eddy, being upon the stand, could be required to express an opinion, if he had one, and that he could not be compelled to study the case or perform labor in order to qualify him to express an opinion. As the witness had formed an opinion which he had committed to a paper which he had with him on the stand, the requirement that he should take the paper in his hand and examine it, to refresh his recollection, was not different in substance or legal effect from a requirement that he should use his mental faculties in listening to a question and in reflecting upon it, in order to give a proper answer. *Barrus* v. *Phaneuf*, 166 Mass. 123. It was not like a requirement that he should study a treatise on a scientific subject. See Wigmore on Evidence, §§ 2192, 2193, 2203, 665 (3), and cases cited.

*Judgments on the findings.*