### HENRY W. BENTON v. MINNEAPOLIS TAILORING & MANUFACTURING COMPANY and Others.

August 4, 1898.

Nos. 11,156—(175).

**Conveyance to Hinder Creditors—Conspiracy—Finding Sustained by Evidence.**

*Held*, in an action brought by an assignee of an insolvent against a corporation, and also against certain of its shareholders, to recover the value of personal property alleged to have been conveyed to and converted by the corporation in pursuance of a combination and conspiracy entered into between said corporation, said shareholders and the insolvent, also a shareholder, to hinder, delay and defraud the latter's creditors, that the evidence sustained a finding of fact that, when so conveyed, the property in question was owned by the insolvent, and also that the conveyance was made with intent to so hinder, delay and defraud, and in pursuance of a combination and conspiracy formed for the purpose between said corporation (through its officers), the insolvent and another shareholder.

**Same—Finding not Sustained by Evidence.**

*Held*, further, that a finding to the effect that E., another shareholder, was a party to, and participated in, this combination and conspiracy, was not supported by the evidence.

**Notice to Agent Notice to Principal—Exception.**

While the general rule is that notice to, or knowledge of, an agent is

notice to, or knowledge of, his principal, and binding on him, there are notable exceptions to the rule; one being that a principal is not bound when the character or circumstances of the agent's knowledge are such as to make it intrinsically improbable that he will inform his principal.

### Constructive Notice not Sufficient to Render Stockholder Liable.

To hold a shareholder personally responsible in an action of the kind, he must have been a party to the fraudulent combination or conspiracy. He cannot be found personally guilty of an actual and intended fraud because he has had imputed or constructive notice thereof.

### Conspirator—Knowledge of Agent not Sufficient.

A person cannot be held as a conspirator simply and solely because his agent may have had knowledge of a conspiracy to defraud, or have been a participant therein.

### Promoter of Corporation—Presumption.

The presumption is that a promoter of a corporation is connected therewith for the legitimate purpose of organization, not for the illegitimate purpose of conspiracy to defraud.

Action in the district court for Hennepin county by plaintiff, as assignee of William A. McLeod, insolvent, against the Minneapolis Tailoring & Manufacturing Company, William A. McLeod, Frederick S. Pratt and Benjamin F. Ellison to set aside an alleged fraudulent sale of personal property, and to recover the value of said property, alleged to be $10,000. The cause was tried before McGee, J., without a jury, and judgment was ordered in favor of plaintiff against each of the defendants for the sum of $9,600. From an order denying their motion for a new trial, defendants appealed. Reversed as to defendant Ellison, and affirmed as to the other defendants.

*F. D. Larrabee,* for appellants.

*F. W. M. Cutcheon* and *Francis B. Tiffany,* for appellant Ellison.

The principal is not bound by the agent's knowledge when the character or circumstances of the agent's knowledge are such as to make it intrinsically improbable that he will inform his principal. 1 Bigelow, Fraud, 239; 1 Am. & Eng. Enc. (2d Ed.) 1145. A frequent application of this principle occurs where the circumstances are such as respondent here alleges them to be, viz.: when the

agent, in the course of the same transaction in which he is employed, commits an independent fraud against his principal, and it is essential to the very existence or possibility of such fraud that he should conceal the real facts from his principal. 2 Pomeroy, Eq. Jur. §§ 674, 675; Cave v. Cave, L. R. 15 Ch. Div. 639; Dillaway v. Butler, 135 Mass. 479; National v. Minch, 53 N. Y. 144; Hickman v. Green, 123 Mo. 165; Frenkel v. Hudson, 82 Ala. 158; Thomson-Houston Elec. Co. v. Capitol Elec. Co., 65 Fed. 341; Musser v. Hyde, 2 Watts & S. 314; Lyne v. Bank, 5 J. J. Marsh, 545; Santiago v. Merchants, 139 Mass. 332; First v. Babbidge, 160 Mass. 563; Kennedy v. Green, 3 Mylne & K. 699; In re European Bank, L. R. 5 Ch. App. 358; Winchester v. Baltimore, 4 Md. 231; Wickersham v. Chicago, 18 Kan. 481; 4 Thompson, Corp. §§ 5205–5209.

*Matthew Gallagher* and *Joseph W. Molyneaux*, for respondent.

COLLINS, J.

Defendant company was duly incorporated under the laws of this state June 26, 1896; its business being the manufacture of clothing. Defendants McLeod and Ellison married sisters of defendant Pratt, and these three gentlemen were the original incorporators, shareholders and first board of directors. Ellison was president, and Pratt held the offices of secretary and treasurer.

For some years prior to the incorporation, McLeod had been a wholesale dealer in woolens at Minneapolis, and had also carried on a merchant tailoring establishment in the same city under the name of the Nicholson Tailoring Company, and had also conducted two similar establishments under the name of the Carrington Company, —one at Duluth, the other at St. Paul. About the middle of June the business was closed at the two last-named places, and the goods removed to, and mingled with the stock in, the wholesale store at Minneapolis. As a matter of fact, nearly all of the goods in the store had been purchased of one concern,—Neal, Morse & Co., of Boston.

Soon after the organization of the corporation, and on July 3, McLeod transferred to it, by bill of sale, the fixtures, of the estimated value of $1,600, and goods in the wholesale store, of the value of $8,000,—a total of $9,600; and the corporation at once com-

menced to do business in the same room, McLeod ceasing all business there at the same moment. This was in accordance with an agreement entered into when the corporation was formed, namely, that Ellison should subscribe and pay for stock shares of the value of $5,000; that Pratt, who was McLeod's bookkeeper, should take and pay for shares of the value of $100, and that McLeod should sell the fixtures and goods to the corporation, and should receive stock shares of the value of $9,600 in payment therefor. Soon after the corporation commenced business, McLeod, who was largely in debt to Neal, Morse & Co., shipped back to them woolens, which did not go into the possession of the corporation, of the value of $3,000; and November 5, 1896, he made an assignment for the benefit of his creditors, the plaintiff being the assignee.

In the complaint herein it is averred that defendants Pratt and Ellison, having knowledge that McLeod was actually insolvent, entered into a conspiracy with him for the purpose and with an intent to defraud his creditors, and to hinder and delay them in the collection of their claims against him; that the corporation was formed for the express purpose of promoting, aiding and accomplishing their purpose and intent; that the sale before mentioned, and the conveyance of the fixtures and goods, were in furtherance of this conspiracy, and made with that object in view; and that the property before mentioned was received, appropriated and converted by the corporation to its own use, with full knowledge of the fraud. As conclusions of law on findings of fact,—a jury having been waived,—the trial court ordered judgment declaring the sale null and void, and for the full value of the goods, as against each defendant. Their appeal is from an order denying a motion for a new trial.

1. Counsel for defendants insist that McLeod did not own the goods transferred by bill of sale to defendant corporation, and that from the evidence it conclusively appears that these goods were then and there the property of Neal, Morse & Co. We need not specify the evidence on which the claim is made, for it can be disposed of by saying that, from the course of dealing for years between the firm just mentioned and McLeod, the court below would have been justified in finding the latter to have been the

owner of the goods sold, even if there had been no written authority given to McLeod to make the sale in question. The writing signed by the firm, of date July 2, 1896, expressly authorized McLeod to make this sale, and, in connection with other facts, abundantly justified the finding.

2. Counsel also argue with great seriousness that McLeod was not insolvent when he conveyed the property to defendant corporation. We shall not waste time in showing in detail the exact condition of his business, then or earlier; but the fact was—and easily demonstrated from his books of account—that in January, 1896, his assets aggregated in value less than one-half of the amount of his liabilities. Realizing his condition, he visited Boston in March, and induced Neal, Morse & Co. conditionally to scale down their claim from over $27,000 to $20,000, and also to extend materially the time of payment; the amount and the extension being evidenced by several promissory notes and a written agreement signed by both parties. June 25 McLeod executed a deed of assignment for the benefit of his creditors, and placed it in Pratt's possession, with the understanding between himself, his legal adviser, and Pratt that he should at once visit Boston for the purpose of obtaining the written consent of Neal, Morse & Co. to a sale of the goods to the corporation; but, if such consent could not be secured, Pratt should be advised by wire, and the deed should be filed at once. As has been stated, the firm gave its consent. Immediate action seemed unnecessary, and, although McLeod was irretrievably insolvent, he did not actually assign until November 5, 1896. His assets did not then exceed $900 in value, while his liabilities were not less than $30,000. His insolvency when he turned over this property to defendant corporation was conclusively established.

3. It is urged with great zeal by defendants' counsel that there was no evidence whatsoever upon which to base a finding that the sale was made with an intent and for the purpose of hindering, delaying and defrauding McLeod's creditors. We have already stated his financial condition, and that his indebtedness largely exceeded his assets. He must have intended the necessary consequences of his own acts. He transferred nearly all of the goods

found in his wholesale store, and all of the fixtures therein contained, available personal property and about all he had, and he closed out the business previously carried on, and accepted as full payment stock shares in a corporation which was nothing but an experiment, which shares had no market value whatsoever. He converted his available personal property into that which was much less available for the payment of his indebtedness; and the transaction had a direct and immediate tendency to hinder, delay and defraud his creditors. Further than this, it was admitted that, of the stock issued to McLeod in payment of the property, he immediately turned over shares of the par value of $5,000 in payment of a note for that amount held against him by his mother-in-law, Mrs. Pratt, and that soon afterwards he pledged the balance of his shares—par value $4,600—with defendant Ellison as security for a loan of $1,500 made by the latter to him. This sum was so borrowed and was used in making a partial payment upon McLeod's indebtedness at a bank. That he pledged shares having a par value of more than three times the amount of money borrowed, and that Ellison required such a pledge, indicate quite clearly that these gentlemen did not have a very exalted opinion of the real value of shares in defendant corporation. Taking into consideration all of the circumstances as they were shown on the trial,— and there were several not specially mentioned herein,—it is very plain that McLeod and Pratt, at least, entered into a conspiracy to hinder, delay and defraud McLeod's creditors, organized the corporation, having that intent and purpose in mind, and then, to complete and consummate the fraud, caused the goods and fixtures to be transferred to it, and the stock shares to be issued in pretended payment. These facts justified the finding on which was rested the order for judgment against McLeod, Pratt and the corporation.

But it is urged that the evidence fails to show that the corporation, as such, had knowledge of, or participated in, the fraud. The articles of incorporation were executed and acknowledged by McLeod and Pratt June 26, and by Ellison June 27. These articles named the latter as president, and Pratt as secretary and treasurer. The bill of sale bore date July 3, and the property was delivered to

the purchaser on that day. The scheme which had been previously formulated, and in part carried out, was completed on the day last mentioned, and the corporation was then fully organized and officered. The knowledge of the fraud had by two of its board of directors (one being its secretary and treasurer) was its knowledge; and it is of no consequence that no meeting of the board of directors was held, and that no by-laws were adopted, until after July 3.

4. This brings us to a consideration of Ellison's rights and liabilities. He resided in St. Paul, and was not shown to have any information concerning McLeod's business affairs or financial condition prior to the time the latter solicited him to take stock in the contemplated corporation. That he was strongly urged to invest his money in the enterprise, and that he did so because it was represented as one apt to prove remunerative was well established by the testimony. It was also established that having an intimation that Neal, Morse & Co. asserted ownership of the goods which McLeod proposed to convey to the contemplated corporation, he employed counsel to investigate the claim and to report. The attorney so employed was Mr. Larrabee, a brother-in-law. After an examination of the facts, Larrabee advised Ellison that, before the corporation could safely complete the transaction and take the goods, written consent would have to be obtained from Neal, Morse & Co.; and it was this advice and conclusion which caused McLeod to go to Boston in June, and to obtain the writing hereinbefore referred to.

There was nothing in these facts tending to indicate that Ellison was personally a party to any combination or conspiracy to hinder, delay or defraud McLeod's creditors. He had been notified that the Boston firm owned the goods. He employed counsel to ascertain and report. He was advised that the firm's consent to a sale would have to be secured before the corporation could safely purchase, and, before going further, he insisted upon such consent being obtained. And this was done. There is no intimation anywhere in the record that Ellison did not act in perfect good faith when he employed counsel to investigate as to the ownership of the goods McLeod proposed to sell or to turn over to the corporation, or when, after such investigation, and in accordance with the

advice of counsel, he required that express permission to sell and turn over be first obtained from the firm which had put the property into McLeod's possession under a conditional contract of sale, and which asserted its ownership until the goods were paid for. If Ellison believed, or had good reason to believe, that the claim of ownership asserted by Neal, Morse & Co. was well founded, he proceeded with due care and caution, and what was done directly refutes the assertion that he was at the time a party to a combination or conspiracy to defraud McLeod's creditors. Not only does it do this, but it is evidence that he proposed to protect those most interested in the disposition of these goods.

But counsel urge that Larrabee knew of the combination or conspiracy to defraud, and was a party thereto, and that his knowledge or complicity must be attributed to Ellison; the presumption being that the agent duly and fully informed his principal. The precise point made by counsel in their brief is that, as Larrabee was the agent and representative of Ellison, the latter is chargeable with the knowledge possessed or obtained by the former, and in some way is responsible for his connection with the fraudulent scheme. This is equivalent to insisting that because Larrabee had been employed as an attorney by Ellison for the purpose of investigating a claim of ownership of the goods made by the Boston firm, and because the former was then a party to, or knew of, the conspiracy, the latter at once became one of the conspirators. We are not required to, and we do not, determine whether Larrabee was a party, or even had knowledge of the conspiracy. If he was a party, or had knowledge, it is not to be presumed that he notified Ellison of the same; for Larrabee was striving to get him interested in the corporation, and it was for Larrabee's interest to conceal any fact which would defeat his efforts.

While the broad proposition is that notice to, or knowledge of, the agent is notice to, or knowledge of, the principal, and binding on the latter, there are notable exceptions to the rule. A principal is not bound where the character or circumstances of the agent's knowledge are such as to make it intrinsically improbable that he will inform his principal. 1 Bigelow, Fraud, 239. This ex-

ception is stated in different language in 1 Am. & Eng. Enc. (2d Ed.) 1145.

But, aside from this, on what rule of law can the notice or knowledge or actual participation of Larrabee in the conspiracy, if such there was, be imputed to Ellison, so as to make him a conspirator? For, to be held personally liable in this action, it must be as a conspirator, and the court below so found. While the corporation, as such, might be a party to a fraud, stockholders who have been innocent and ignorant of the transaction are not personally liable, and this is conceded by counsel. Attribute to Ellison all that Larrabee is alleged to have known, and he had merely constructive or imputed notice of the scheme. This could not make him a conspirator, nor would it justify the finding to the effect that he was guilty of actual and intentional fraud. Imputed or constructive notice cannot be relied on to support a charge of direct, personal conspiracy to defraud. It is not unlike a case where actual notice is imputed to a principal because of the mental condition of his agent.

"Actual malice," said the court in Reisan v. Mott, 42 Minn. 49, 43 N. W. 691, implies a wrongful "purpose or intent in the mind of the person whose conduct is in question. It is not to be conclusively presumed or legally imputed to him merely because of the mental condition or the knowledge of another person, however related to him."

A man cannot be associated with others in a conspiracy, civil or criminal, or be held guilty of acts done in pursuance of such association, merely because his agent may have knowledge of the same, or be a participant therein. He cannot enter into a combination of two or more persons to accomplish by concerted action some demand or unlawful purpose, or to accomplish some purpose, not criminal or unlawful in itself, by criminal or unlawful means, simply and solely because of the mental condition or physical acts of his agent.

It has been suggested that Ellison might be held responsible for the result of a conspiracy because he was one of the original incorporators or promoters of the corporation. We do not understand that a stockholder is a promoter simply because he is a subscriber,

and among the original incorporators; but, if Ellison was a promoter, the presumption is (and there is no evidence tending to rebut this presumption) that it was for the legitimate purpose of organization, not for the illegitimate purpose of conspiracy to defraud.

5. There is no merit in the contention that a new trial should have been granted upon the ground of newly-discovered evidence.

Order reversed as to defendant Ellison, and affirmed as to the other defendants.