## BRADLEY v. DAVIDSON.

EQUITY; PLEADING; EVIDENCE; EXCHANGE OF LANDS; BROKERS; FRAUD; CUSTOM; REMEDY AT LAW; LACHES; WITNESS; CROSS-EXAMINATION; EXPERTS; PARTIES TO ACTION.

1. The answer in a suit in equity is not evidence, where an answer under oath is waived, and the hearing is not upon bill and answer. (Citing *Baker v. Cummings*, 4 App. D. C. 230; and *Forrest v. Wardman*, 40 App. D. C. 520.)

2. Answers to interrogatories in a bill in equity required to be under oath are evidence only in so far as they are responsive to the interrogatories.

3. A firm of real estate brokers are liable to a client, towards whom they occupy a confidential relationship, for the damages resulting to him from their breach of trust in effecting, while secretly representing the other party, an exchange of valuable property of their client for the equity, known by them to be of little value, of the other party in other property.

4. The existence of a custom among real estate brokers in cases of exchange of properties to divide the commission between the two

NOTE.—On fraud and secret dealings of real estate brokers as affecting their commissions, see comprehensive note in 45 L.R.A. 33, and note in 24 L.R.A.(N.S.) 659.

brokers is no defense to a suit to set aside an exchange of property in which the plaintiff's brokers secretly represented the other party, for the reason that no custom will be permitted to override a positive and salutary rule of public policy.

5. A bill in equity to set aside an exchange of real estate for fraud of the plaintiff's brokers in effecting the exchange will not be dismissed upon the ground that an action at law would have afforded the plaintiff adequate relief. (Mr. Chief Justice SMYTH dissenting.)

6. The plaintiff in a suit in equity to set aside an exchange of real property for fraud of her brokers in effecting the exchange will not be held guilty of laches, where the allegation in the bill that she recently discovered the fraud is not denied in the answer, and must therefore be deemed to be admitted by the defendants. (Mr. Chief Justice SMYTH dissenting.)

7. While the plaintiff, in an action based upon fraud, by calling as a witness a party to the alleged fraud, waives the right to impeach him in the ordinary manner permitted in cases of witnesses called by the opposing party, he may elicit from the witness by cross-examination all germane facts and circumstances, to the end that the real situation may be made to appear. (Citing *Dumas* v *Clayton*, 32 App. D. C. 566.)

8. A real estate broker may be compelled to testify as an expert, without any compensation other than the fee of an ordinary witness, as to the value of property which he has previously appraised.

9. A suit in equity to rescind a conveyance of land for fraud after the death of the injured party must be brought in the name of his heirs at law or devisees. (Following *Webb* v. *Janney*, 9 App. D. C. 41.)

No. 3048.    Submitted November 8, 1917.    Decided February 4, 1918.

HEARING on an appeal from a decree in the Supreme Court of the District of Columbia, sitting as an equity court, dismissing a bill to set aside an exchange of real estate.

*Reversed and remanded.*

The COURT in the opinion stated the facts as follows:

This appeal is from a decree in the supreme court of the District dismissing a bill to set aside an exchange of real estate.

The case stated in the bill is substantially as follows: On or about December 9, 1910, Henry Bradley, since deceased, the

husband of appellant and a resident of Maryland, was the owner in fee of lot 28, block 7, Washington Heights, this city, improved by a dwelling house known as No. 1832 Columbia Road, N. W., worth about $12,000 and unencumbered.

H. Bradley Davidson, at the time of the exchange hereinafter mentioned, was a member of the partnership firm of Davidson & Davidson, real estate brokers in the District of Columbia. They were the agents of Mr. Bradley for the collection of rents, the management of his property, the arranging of said exchange and the terms thereof, and at all times well acquainted with the value of said property. They also were the agents of Mr. Bradley in the investment of his money in real estate securities in this District, and "he relied exclusively and absolutely upon 'the declarations, statements, and representations made to him by the defendant, H. Bradley Davidson, and the said firm of Davidson & Davidson, in respect to said exchange of properties and in respect to all of said investments."

On or about the 28th of November, 1910, H. Bradley Davidson, for his firm, wrote a letter to Mr. Bradley stating that Davidson & Davidson were offered a very attractive apartment house, renting for $6,000 per annum and subject to an encumbrance of $35,000, in exchange for Mr. Bradley's Columbia Road house, and that the firm believed he would get $1,000 or $1,500 a year net out of the apartment house. A few days thereafter the firm again wrote Mr. Bradley, urging the acceptance of the above offer of exchange. Mr. Bradley, relying upon these statements and representations, and upon the further statement alleged to have been made by H. Bradley Davidson that the value of the equity in the apartment house "was then about the same as the value of the said Columbia Road property free of encumbrance, namely, about $12,000, and upon the further statement and representation made by the defendant H. Bradley Davidson to the said Henry Bradley that said encumbrance, consisting of a first trust for $30,000 and a second trust for $5,000, and both maturing on or about the 20th day of March, 1912, could be renewed without difficulty, consented to and agreed to make said exchange, and adopted said offer of exchange." Thereafter, on the 6th day of December, 1910, David-

son & Davidson mailed to Mr. Bradley a deed conveying said Columbia Road property to the defendant Frank O'Neil, and suggested that it be executed without delay. In this letter Davidson & Davidson stated that they "had made the holder of the second trust knock off another $1,000, thereby making said second trust $4,000." Relying upon the representations made by Davidson & Davidson, the Bradleys, on the 9th day of December, 1910, executed the deed, and in due course received through Davidson & Davidson a deed from O'Neil conveying the equity in said apartment house to Mr. Bradley. Davidson & Davidson, "acting as the agent of said Henry Bradley in the making of said exchange, charged said Henry Bradley, and were paid by him the sum of $180 as a commission therefor."

Mr. Bradley died on January 29, 1911, leaving a will in which he made Mrs. Bradley, the plaintiff, his sole devisee and legatee. This will was admitted to probate in Maryland, but, by reason of a caveat being filed thereto, was not finally established until June 25, 1914.

Shortly before the encumbrances on the apartment house fell due on March 20, 1912, Mrs. Bradley requested Davidson & Davidson to arrange for the renewal of the same, and was informed by them that the owner of the first trust would not renew without a curtail of $5,000. The estate of her husband then being in litigation, she was unable to meet this demand, although she endeavored to obtain this money from other sources. The apartment house, therefore, was sold at public auction under the second trust, and was bought in by the holder of that trust for the amount of the encumbrances thereon, Mrs. Bradley being in no position to protect her interest.

Some time thereafter Mrs. Bradley "became suspicious of the character of said exchange and consulted her attorney in regard to the matter," and, "after an investigation of the same * * * she recently discovered and therefore avers and charges upon information and belief" that the value of said apartment house at the time of said exchange was not $46,000, as represented by Davidson & Davidson, but, on the contrary, was no more than the encumbrances, which fact was well known

to the Davidsons at the time they negotiated the exchange; that the second trust was a fake trust placed upon the property for the purpose of deceiving the purchaser; that Davidson & Davidson, although they pretended to act solely as the agent for Bradley, "secretly, fraudulently, and unknown to the said Henry Bradley, combined with, and in conjunction with another, or others, acted also as the agents of the said O'Neil or the real owner of said apartment house, in the matter of said exchange, and were paid and received therefor a commission from said owner; that the defendant O'Neil had no real interest in said transaction, but was merely a straw man and of no financial responsibility, and was fraudulently, secretly, and unknown to the said Henry Bradley, used by the defendant H. Bradley Davidson and the said firm of Davidson & Davidson and others merely as a channel to receive for their use, benefit, and profit, the title to said Columbia Road property, and to convey said apartment house to the said Henry Bradley; that the defendant O'Neil and the persons purporting to represent him knew at the time of said exchange that the defendant H. Bradley Davidson and the said firm of Davidson & Davidson held themselves out to the said Henry Bradley as acting therein as the agents of the said Henry Bradley alone; that the defendant H. Bradley Davidson and the said firm of Davidson & Davidson obtained from the said Henry Bradley by reason of said exchange, for their own personal benefit and gain, said Columbia Road property, or an interest in same, or a cash consideration in lieu thereof; that the whole transaction was a fraud upon the said Henry Bradley and plaintiff, and that the defendant H. Bradley Davidson and the said firm of Davidson & Davidson with the assistance of the real owner of said apartment house, and the defendant O'Neil, defrauded and cheated the said Henry Bradley out of said Columbia Road property."

During the one year and four months said apartment house was held by the Bradleys, the net income therefrom did not exceed $320.

The prayers of the bill are that the defendants be required to answer the bill, "but not under oath, oath being expressly waived;" that the defendant H. Bradley Davidson, the firm of

Davidson & Davidson, and Frank O'Neil, be required "to discover fully in their answers to this bill and to the interrogatories hereto annexed, the several amounts of money received by them, and from whom received, and just what connection they, and each of them, had with the transaction." There is an appropriate prayer as to Hight and Hunter, and it then is prayed that, upon final hearing, the transaction may be set aside and the plaintiff placed in *statu quo,* or, if said Columbia Road property has passed into the hands of an innocent purchaser for value, that defendant H. Bradley Davidson or Davidson & Davidson, and the defendant Charles W. Simpson, be compelled to pay plaintiff the value of that property. The final prayer is for general relief.

The defendants George O. Walson and Charles W. Clagett, trustees under the second deed of trust, answered under oath that, so far as they were advised, the trust was given to secure the purchase money for the land upon which said apartment house was built. Mr. Hight, the holder of the second deed of trust, and Mr. Hunter, the maker of the notes thereby secured, in separate answers under oath stated that the trust was given for the purpose declared by said trustees and for no other purpose.

H. Bradley Davidson and Davidson & Davidson filed an answer. In this answer they deny that Henry Bradley "relied absolutely and exclusively upon the declarations, statements, and representations made to him by these defendants, in respect to said exchange and in respect to all of his investments in real estate securities." They aver that Mr. Bradley was familiar with real estate values in the District; that Davidson & Davidson "were offered, through the real estate firm of Simpson & Sullivan, an exchange of the Fillmore Apartment House, subject to encumbrances of $35,000 for the Columbia Road property," and communicated this offer to Mr. Bradley "by letter and by personal interview;" that Mr. Bradley thereafter "made a full and complete personal examination and investigation of the value, income, expenses, and all matters which might in any way guide or influence him in deciding whether or not he would accept said offer; that he visited said apartment

house in person for this purpose;" that as a result of his investigations in connection with the transaction he directed the firm to make the exchange; that the firm had no information as to the transaction that was not communicated to Mr. Bradley; "that they explained to him that his share of the commission on said exchange would be $180, and that the balance, $400, would be paid by the owners of the apartment house;" that when asked by Mr. Bradley whether the trusts on the apartment house could be renewed in whole or in part they advised him "that they thought he would have no difficulty in arranging the matter, or something to that effect." It is denied that the value of the apartment house was not in excess of the amount of the trusts thereon, and proof on that point is called for, if material. It further is denied that the second trust was a fake trust.

The answer further denies that there was any fraud on the part of Davidson & Davidson, or that they in any way deceived Bradley. It is averred "that it is not only the custom in this District in cases of exchange of properties to divide the commission between the two brokers, with which custom said Bradley was familiar, but in this particular case said Bradley was informed just what the arrangement for commission to these defendants was, namely, that he, Bradley, would pay $180, and that the owner of said apartment house would pay $400; that these defendants in no way represented the owner of said apartment house, that they did not even know the owner, that all their negotiations were with the said firm of Simpson & Sullivan, who represented the owner of said apartment house." It further is denied that the net income did not exceed $320.

Coming to the interrogatories, to be answered under oath, the first of which called for a statement as to what commission the firm or any member of it received, directly or indirectly growing out of the exchange, the answer states that the firm received "by way of compensation or commission on said exchange, with the full knowledge and consent of Henry Bradley, $180 from said Henry Bradley, and $400 from the real estate firm of Simpson & Sullivan, who represented the owner of said apartment house." In answer to the question as to "who was

the real owner of the apartment house," it is stated that "they (the firm) had no knowledge as to who was the real owner of the apartment house." The next question called for information as to the length of time the title to the apartment house had been in the then owner, and the answer was that "they (the firm) had no knowledge on this subject, all their dealings were had with Simpson & Sullivan, who represented the owner." The next question was as to "who became the real owner or owners at the time of the exchange or just after the exchange, and for how long a period was it held." To this the firm answered that "they had no knowledge that the real owner was other than the record owner." In answer to further questions it is stated that the firm had no interest whatever in the apartment house, either before, at the time of, or subsequent to, the exchange; nor did they have any interest in the Columbia Road property.

Further answering the bill, the Davidsons state that if plaintiff ever had any cause of action against them she is guilty of laches to such an extent as to deprive her of equitable relief; that her alleged cause of action did not occur within three years prior to the filing of her suit; that she has a complete remedy at law; and that she is not entitled to maintain the suit in her own name. This answer was sworn to by H. Bradley Davidson.

The defendant O'Neil failing to enter an appearance, a decree was entered against him.

Thereafter the cause came on for hearing, and the plaintiff offered in evidence the will of Mr. Bradley, which showed her interest to be as alleged in the bill. She then introduced the deed to the Columbia Road property and the deed from O'Neil conveying the apartment house to Henry Bradley. William D. Sullivan, who at the time of said exchange was a member of the firm of Simpson & Sullivan, then was called as a witness and asked to produce all contracts and papers relating to said exchange. He produced the contract of sale, in which Davidson & Davidson, *as parties of the first part,* agreed to exchange said Columbia Road property, free and clear of all encumbrances, with Frank O'Neil, *as party of the second part,* for the Fillmore Apartment House, subject to an encumbrance of $34,000. This witness also produced a statement rendered Davidson & David-

son by Simpson & Sullivan, in which Davidson & Davidson
are credited with the commission of $400. This sum,
the witness testified, "was commission paid to Davidson
& Davidson by witness's firm in the sale of the properties in
question." On cross-examination by counsel for the Davidsons,
the witness stated that he did not know how this amount was
arrived at; "that his firm represented the owner of the apart-
ment, Mr. O'Neil."

O'Neil then was called as a witness, and testified that he
never was the actual owner of the Fillmore Apartment House,
and that he never had any interest in it. In response to an
inquiry as to whether he signed the deed of trust note on the
Columbia Road property, he replied that he did not know, but
he did know "that he got no money out of the transaction if he
did sign such a note." On cross-examination the witness testi-
fied that he did not know the Davidsons, and had had no com-
munication with them, nor did he know whether they were ad-
vised that he had no interest in the property.

Mr. George Y. Worthington, president of the District Real
Estate Brokers Association, then was called as a witness and
testified that in his opinion the Fillmore Apartment House
"should be quoted somewhere from $35,000 to $38,000."

H. L. Rust, a real estate broker and a member of said Real
Estate Brokers Association Appraisement Committee, then was
called as a witness, and asked whether he was familiar with the
value of property in the neighborhood of the Fillmore Apart-
ment House. Witness inquired what right counsel had to ask
him that question and the purpose of the question. Counsel
answered that he was trying to qualify him as an expert. Wit-
ness replied that he did not wish to be qualified; that he was
not asked to appear as a witness, but was subpoenaed to appear
"without notice." The court ruled that the witness could not
be compelled to testify. Counsel then asked witness whether
he had made a valuation of the apartment house within a month,
and he replied: "I won't even answer that if I am not obliged
to." The witness then was shown a letter addressed to the sec-
retary of his committee, requesting that committee to make an
appraisement of said apartment house, and referring to a check

for $42 and offering to pay any additional charge, should that amount prove insufficient. The witness admitted that the committee accepted the check and a small additional charge for making the requested appraisal, but persisted in declining to testify concerning the value of said apartment house; and the court, over the objection and exception of the plaintiff, ruled that he could not be compelled to do so. Another member of the appraisal committee was called, and the same rulings and exceptions resulted.

John C. Davidson, of the firm of Davidson & Davidson, was called as a witness for the plaintiff, "for cross-examination on his answer," and testified that, so far as he knew, all of the investments of his uncle, Henry Bradley, were made by his firm, and that his uncle usually accepted the firm's judgment: that the firm had authority to take Mr. Bradley's notes out of bank and substitute new ones for them. The witness identified letters written by his brother, H. Bradley Davidson, to Mr. Bradley concerning the exchange of said properties, and the statement of account sent Mr. Bradley at the time of the exchange. In this statement is the following item: "To Com. 1½% on $12,000, $180.00." Witness stated that his uncle was injured some time in December of 1910, and died in January of 1911."

On cross-examination by his counsel witness further testified that on some days his uncle was intoxicated and on other days sober; that "he saw his uncle during the negotiations; that when he went up to the apartment house he was perfectly sober; that he asked witness to go to the apartment house with him," and that witness complied with the request; that they, together with Mr. Fristoe, who was connected with the firm, went over the building carefully, and that his uncle interviewed some of the tenants in regard to the rents and inspected the building thoroughly; that the sale was consummated after this visit. Thereupon counsel for the plaintiff asked the witness whether he had not stated in the case involving the will of Henry Bradley that he did not think his uncle "understood fully what obligations he was assuming" when the exchange was made, and witness replied that he had so testified. Witness further admitted

that he had testified in the same case that "the transaction (exchange) was not carried through with my consent or approval."

Plaintiff offered evidence concerning efforts made to renew the trusts on the apartment house, and, in reply to an inquiry from the court as to the relevancy of the testimony, counsel for the plaintiff stated that it was then that the plaintiff "discovered the fact the property was not what it was represented to be." It was conceded that the gross rentals from the apartment house prior to the exchange were $5,760 instead of $6,000, and there was evidence that immediately after the exchange the receipts were materially reduced. Thereupon, the plaintiff having rested, counsel for the defendants moved for a decree, which motion the court sustained and dismissed the bill.

*Mr. W. Gwynn Gardiner* and *Mr. Julian W. Whiting* for the appellant.

*Mr. D. S. Mackall* and *Mr. J. Barrett Carter,* for the appellees, in their brief cited:

*Baker* v. *Cummings,* 4 App. D. C. 230, reversed in 169 U. S. 189; *Balue* v. *Taylor,* 136 Ind. 368; *Banks* v. *Trimble,* 108 Ky. 230; *Bartelott* v. *Banks,* 119 Ill. 259; *Boyd* v. *Mouro,* 32 S. C. 249; *Campbell* v. *Boggs,* 48 Pa. 524; *Campbell* v. *Wilson,* 2 Mackey, 497; D. C. Code, sec. 1265; *Dravo* v. *Fabel,* 132 U. S. 487; *Dumas* v. *Clayton,* 32 App. D. C. 566; Greenhood, Pub. Policy, Rule CXXX; Greenl. Ev. 3, ¶ 36; *Handy* v. *Smith,* 30 W. Va. 195; *Jones* v. *Abrahams,* 75 Va. 466; *Kane* v. *Paul,* 14 Pet. 33; *Lemster* v. *Warner,* 137 Ind. 79; *Love* v. *Butler,* 129 Ala. 531; *McBratney* v. *Chandler,* 22 Kan. 482; *McDonald* v. *McGuire,* 8 Tex. 361; Maryland Code, ¶ 36, art. 93; *Mason* v. *Henry,* 152 N. Y. 529; *Munnikhuysen* v. *Magraw,* 35 Md. 280; *Pacy* v. *Cosgrove,* 113 Md. 315; *Palmer* v. *Fleming,* 1 App. D. C. 528; *Patten* v. *Warner,* 11 App. D. C. 149; *Prewell* v. *Dyer,* 107 Cal. 154; *Red Cypress Lumber Co.* v. *Perry,* 118 Ga. 876; *Redmond Bros.* v. *Henke.* 137 Iowa, 228; *Sallinger* v. *Black,* 68 Ark. 449; *Security Invest. Co.* v. *Garrell,* 3 App. D. C. 69; *Shappiro* v. *Goldberg,* 20 App. D. C. 185, affirmed in

192 U. S. 232; *Schultz* v. *Hansborough*, 33 Gratt. 567; *Stewart* v. *Richey*, 17 N. J. L. 164; *Stripling* v. *Maguire*, 108 Mo. App. 594; *Tynan* v. *Walker*, 35 Cal. 634; *Underhill* v. *Insurance Co.* 67 Ala. 45; *United States* v. *Cooper*, 21 D. C. 491; *Warner* v. *Jackson*, 7 App. D. C. 211; *Wasser* v. *Western Land Securities Co.* 97 Minn. 460; *Willard* v. *Wood*, 1 App. D. C. 44, affirmed in 164 U. S. 502.

Mr. Justice ROBB delivered the opinion of the Court:

The first question logically to be considered is what effect is to be given the answer of the defendants Davidson & Davidson. Answer under oath having been waived, and the hearing not having been upon bill and answer, the answer is not evidence. *Baker* v. *Cummings*, 4 App. D. C. 230, 263; *Forrest* v. *Wardman*, 40 App. D. C. 520, 529. See also *Conley* v. *Nailor*, 118 U. S. 127, 134, 30 L. ed. 112, 114, 6 Sup. Ct. Rep. 1001; *Dravo* v. *Fabel*, 132 U. S. 487, 489, 33 L. ed. 421, 422, 10 Sup. Ct. Rep. 170.

It is insisted, however, that inasmuch as answers to the interrogatories were required to be under oath, they are evidence. In so far as these answers are directly responsive to the interrogatories, the contention is sound, but it is clear to us that a party, by interjecting statements not called for by the interrogatories, may not thereby render such statements evidence and avoid the danger of becoming a witness. Thus in *Dravo* v. *Fabel*, the court, speaking of the answers to the bill, said that they, "being *directly responsive* to the bill," were evidence, since answers under oath had not been waived. In the present case the Davidsons were asked what commission the firm directly or indirectly received on account of the exchange of the properties in question. This question admitted of a categorical answer. Nevertheless, there was interjected into the answer a statement that the $400 paid by Simpson & Sullivan was received "with the full knowledge and consent of Henry Bradley." To hold that this statement, which was not directly responsive to the question, is evidence, would be to countenance a mischievous practice and make possible in many cases the avoidance of sec.

1064 of the Code [31 Stat. at L. 1357, chap. 854], to the effect that, where one of the original parties to a transaction or contract has died, the other party shall not be allowed to testify "as to any transaction with or declaration or admission of the said deceased." In the case before us Mr. Bradley is dead. All the written evidence of the transaction, instead of showing knowledge on his part of the payment by Simpson & Sullivan, who represented the owner of the apartment house, of $400 commission to the Davidsons, who were the agents of Mr. Bradley, tends to show the contrary. We are clearly of opinion that this statement is not evidence, and therefore may eliminate it from consideration.

Inasmuch as a discussion of the facts which were before the court when the motion of the defendants that the bill be dismissed was granted will be determinative not only of the question whether the ruling was right, but also of the question whether the plaintiff was guilty of laches, and the related question whether she had a complete and adequate remedy at law, we now will consider that evidence. That the Davidsons occupied a confidential relationship towards their uncle clearly appears. That he relied, and had a right to rely, upon their representations and advice generally in making real estate investments in the District is equally certain. They made all their uncle's investments, had authority to take his notes out of bank and substitute new ones for them, and generally, according to the express admission by one of the members of the firm, he accepted the firm's judgment. These facts are very material, and must be kept in mind in the consideration of the evidence concerning the particular transaction here under review. Mr. Bradley owned this dwelling house free of encumbrance, and, under the evidence, we must assume it to have been worth about $12,000. He received a letter from one of the Davidsons in which the statement was made that the firm had been offered "a very attractive apartment house * * * renting at $6,000 per annum," and that "we would like you to see it, as we think you would get from $1,000 to $1,500 a year net out of the property." A few days thereafter the same nephew wrote his uncle that if he (the nephew) owned the Columbia Road

house, and was offered the exchange, he would accept it. Indorsed on this letter was the following:

| Notes (trust notes) | $35,000 |
| House | 12,000 |
| | $47,000 |

This shows that the Davidsons were representing to Mr. Bradley that he would be paying $47,000 for the apartment house, and inferentially, of course, representing that it was of that value. It is true that Mr. Bradley came to Washington and inspected the apartment house, but he inspected it with one of the Davidsons, whom he had a right to assume was representing him and no one else in the transaction. The exchange was effected and Mr. Bradley deeded away his unencumbered house, the value of which thus had been fixed by the Davidsons at $12,000, and received therefor an apartment house which, under the evidence, we must find was encumbered for about all it was worth. Mr. Bradley was injured within a very little time after this exchange was made, and his death resulted soon thereafter. His will was admitted to probate, but, as appears from the testimony of John C. Davidson, there was a contest over the will, which had not been settled in 1913.

When the trust notes came due in the spring of 1912 Mr. Bradley's will was in litigation, but a representative of Mrs. Bradley interviewed the Davidsons with reference to a renewal of those notes, and, as averred in the bill and admitted in the answer, the property was sold at public auction for the amount of the indebtedness thereon. When asked by the court as to the relevancy of this evidence, counsel for plaintiff stated: "This is when we discovered the fact the property was not what it was represented to be." It further developed that the income from the apartment house was less than it was represented to be at the time of the exchange, but it was not until the answer of these defendants was filed that plaintiff could have felt sure that their representations as to the value of the apartment house and the advisability of the exchange were not made in good

faith; for it was not until then, under the evidence before us, that it was definitely known that they represented the owner of the apartment house as well as Mr. Bradley. The statement rendered Mr. Bradley makes no mention of any commission other than the commission of 1½ per cent upon the value of the property which they exchanged for him. The statement rendered the Davidsons by Simpson & Sullivan, which came to light while Sullivan was on the witness stand, credits the Davidsons with the $400 commission, which was paid the Davidsons by Simpson & Sullivan, as representatives of the owner of the apartment house. When asked how this amount was arrived at, Mr. Sullivan said he did not know.

It thus appears from the evidence that was before the court when this bill was dismissed, that agents sustaining a confidential relationship to their principal, who was paying them for and entitled to their services and advice, grossly betrayed their trust by secretly representing the other party. Said this court in *Mannix* v. *Hildreth,* 2 App. D. C. 259: "Any attempt to occupy the relation of agent to two persons whose interests conflict, whether with or without notice to them, is to be condemned as contrary to good morals and the principles of equity." In *Rawlings* v. *Collins,* 36 App. D. C. 72, 77, this court, speaking through Mr. Justice Van Orsdel, said that "the principal will be protected against any concealed, undisclosed action on the part of the agent, whereby the agent or anyone whom he secretly represents may secure an unfair advantage or occupy a position where a possible fraud might be perpetrated. * * * This is especially true where the agent and the purchaser are either the same person or acting in collusion." Again, in *Fox* v. *Patterson,* 43 App. D. C. 484, 493, this court said: "Instead, therefore, of Mr. Fox being in a position to act solely in the interest of Mrs. Patterson, he had secretly assumed a position antagonistic to her. Such conduct cannot be too strongly condemned, and where it has occurred the principal may repudiate the entire transaction and enforce reparation for losses sustained." In that case Fox was the agent and was compelled to make good the damages resulting from his lack of good faith. In *Forrest* v. *Wardman,* 40 App. D. C. 520, which

was a bill to set aside certain conveyances on the ground of fraud, it appeared, as here, that one party secretly had paid a commission to the agent of the other party. This court said: "The question is whether Wardman [the party secretly paying the commission] is to be held, and, if so, in what amount. The facts which have been recited in this opinion make it unnecessary to enter into any discussion of the law upon the first part of that question. It would be a disgrace to the law if it were necessary to cite any authorities to show that a defendant, who has been found to have secretly purchased the services of the complainant's agent in effecting an exchange of properties between the complainant and the defendant, is legally and equitably responsible and liable to make good to the complainant whatever loss the complainant has legally or equitably sustained. That is what the defendant Wardman has done. If the properties transferred to him were still in his power to restore, there can be no doubt that a court of equity would have power and right to order the reconveyance."

These adjudications settle beyond peradventure the right of the plaintiff to have the transaction under consideration set aside and the Columbia Road property restored to her if that now may be done, and, if that is not possible, to fasten upon the apartment house owner a role thus far assigned to the straw man O'Neil, liability in damages for losses sustained.

Nor do we think there is any doubt, under the evidence before us, as to the liability of the Davidsons for the damages resulting from their breach of faith. In the *Fox Case* the agent was compelled to respond in damages because, as here, he secretly had assumed a position antagonistic to his principal, and injury had resulted therefrom. That case involved an exchange of properties, and it appeared that Fox secretly had acquired an interest in the property which was to be taken in the exchange by his principal, but the basis of our ruling was his breach of trust which, as here, resulted in a total loss to his principal. The legal result is the same, whatever may be the fruit of the agent's double dealing. The degree of his success or the particular means employed to effect his ulterior purpose cannot change the character of that purpose or afford the wrong-

doer escape from liability for the result of his duplicity. Under the evidence before us it must be assumed that the Davidsons, when they advised the making of this exchange by their uncle, whose agents they were, knew that he would be exchanging a $12,000 house for an equity of little, if any, value. In other words, they knew that their bad faith and breach of trust inevitably would result in a loss to their principal. Clearly, therefore, they should be held responsible for that loss. And this is no new doctrine. In *Hunsaker* v. *Sturgis,* 29 Cal. 142, it was ruled that even where a person voluntarily becomes an unpaid agent of another to negotiate a sale of stock of a corporation, and then receives a certain sum from the purchaser as a reward for acting in his behalf and procuring a sale for less than the purchaser was willing to pay, the agent becomes liable to the owner for the loss he sustained by this breach of confidence. In that case it further was held that, even admitting that the defendant was not an agent *eo nomine,* the fact that a special confidence was reposed in the defendant which he knowingly betrayed to the damage of those by whom he was trusted, and for a mercenary reason, was "even more than enough to hold the defendant." See also *Morrison* v. *Ogdensburgh & L. C. R. Co.* 52 Barb. 173, 182; *Dazey* v. *Roleau,* 111 Ill. App. 367; *Wiruth* v. *Lashmett,* 82 Neb. 375, 117 N. W. 887.

The suggestion, in the answer of the Davidsons, that it is a custom in this District "in cases of exchange of properties to divide the commission between the two brokers," may be summarily put out of view, for the reason that no custom will be permitted to override a positive and salutary rule of public policy.

It requires no citation of authorities to demonstrate that this peculiarly is a case for a court of equity, where all the facts may be brought to light, and, if the evidence warrants, the transaction may be set aside or those responsible for the wrong may be required to respond in damages. To us it is perfectly clear that an action at law would not have afforded this plaintiff adequate relief. "The jurisdiction in equity attaches unless the legal remedy, both in respect to the final relief and the mode of obtaining it, is as efficient as the remedy which equity would

confer under the same circumstances." *Kilbourn* v. *Sunderland,* 130 U. S. 505, 514, 32 L. ed. 1005, 1008, 9 Sup. Ct. Rep. 594.

Nor do we find any greater merit in the defendants' contention that plaintiff was guilty of laches. It is a familiar rule that the period of delay or neglect necessary to constitute laches varies with the peculiar circumstances of each case, and, unlike the Statute of Limitations, is not subject to an arbitrary rule. "It is an equitable defense, controlled by equitable considerations, and the lapse of time must be so great, and the relations of the defendant to the rights such, that it would be inequitable to permit the plaintiff to now assert them." *Halstead* v. *Grinnan,* 152 U. S. 412, 417, 38 L. ed. 495, 497, 14 Sup. Ct. Rep. 641. In *George* v. *Ford,* 36 App. D. C. 315, 333, this court, speaking through Mr. Chief Justice Shepard, said: "So great is its abhorrence of fraud and the violation of fiduciary obligations, that a court of equity will look with some indulgence upon mere delay, from which no material injury has resulted." See also *Lewis* v. *Denison,* 2 App. D. C. 387, 391; *Baker* v. *Cummings,* 4 App. D. C. 230, 273; and *Ackerman* v. *McIntire,* 7 App. D. C. 443.

In the present case it is averred in the bill, as previously set forth, that some time after the foreclosure of the trusts upon the apartment Mrs. Bradley "became suspicious of the character of said exchange and consulted her attorney in regard to the matter, and that, after an investigation of the same, plaintiff says that, upon information and belief, she *recently discovered* and therefore avers and charges upon information and belief" the facts upon which she asks for a decree. Under rule 30 of the equity rules of the Supreme Court of the United States, which of course are controlling in this jurisdiction, "averments other than of value or amount of damage, if not denied, shall be deemed confessed." It, therefore, was incumbent upon the defendants to make answer to the above averments of plaintiff's bill, and this they did not do. In other words, if the defendants were aware of any previous knowledge by Mrs. Bradley concerning the acceptance of double commissions by the Davidsons, it was their duty to say so in their answer. The

Davidsons did not hesitate to make such an averment as to Mr.
Bradley, whose lips were scaled, and their failure to include
Mrs. Bradley certainly may not be attributed to oversight. It
is clear that we must accept this averment as an admitted fact.
The Davidsons and the owner of the apartment house, through
Simpson & Sullivan, perpetrated a fraud upon Mr. Bradley and
concealed the real evidence of that fraud. See *Faust* v. *Hos-
ford,* 119 Iowa, 97, 100, 93 N. W. 58; *Jackson* v. *Pleasanton,*
95 Va. 654, 29 S. E. 680. Their concealment, therefore,
amounted to a continuation of the original fraud. They made
known the facts when, and when only, they were compelled to
do so; and a court of equity would be forgetful of its true
province should it rule that, in these circumstances, the plaintiff
was guilty of laches. The defendants appear "in an atmosphere
so contaminated with secrecy and opportunity for unfair deal-
ing, and so foreign to the proprieties of agency, that it shocks
the refinements of equity." *Rawlings* v. *Collins,* 36 App. D. C.
72, 78.

It is insisted next that, having called John C. Davidson as
a witness, plaintiff was bound by his testimony, and should not
have been permitted to cross-examine him. In *Dumas* v. *Clay-
ton,* 32 App. D. C. 566, 574, this court said: "In cases like
this, it is generally necessary to call and examine the parties to
the alleged fraud, and because of their adverse interest they
may be treated as witnesses on cross-examination. The object
of the right of such cross-examination is to draw out of an un-
willing witness all such circumstances as may tend to establish
the perpetration of the fraud.   *   *   *   If a witness makes a
direct statement, and then discloses circumstances inconsistent
therewith, it is for the jury or court to determine what is to be
believed." In other words, while by calling Mr. Davidson as
a witness plaintiff waived the right to impeach him in the ordi-
nary manner permitted in cases of witnesses called by the
opposing party, it was proper to elicit from the witness by cross-
examination all germane facts and circumstances, to the end
that the real situation might be made to appear.

It was error for the court not to compel the testimony of the
witness Rust and the other members of the so-called Real Estate

Brokers Association Appraisement Committee. They were regularly subpœnaed, not for the purpose of compelling them to go out and make an appraisal of this property, but to appear on the witness stand and testify as to facts within their knowledge. Apart from statute it may be laid down as a general rule that an expert witness may be compelled to testify as to matters of a professional opinion, or matters of which he has gained a special knowledge by reason of his professional training or experience, without any compensation other than the fee of an ordinary witness. The question is very fully considered in *Dixon* v. *People,* 168 Ill. 179, 39 L.R.A. 116, 48 N. E. 108, and it there was held that a physician subpœnaed and interrogated as an expert witness cannot refuse to testify upon the ground that no compensation greater than allowed to ordinary witnesses has been promised or paid him. And in *Stevens* v. *Worcester,* 196 Mass. 45, 56, 81 N. E. 907, it was ruled that a witness qualified as an expert as to a certain subject may be required to express an opinion regarding that subject, if he has one, but cannot be required to perform labor in order to qualify him so to do. In that case, as here, the witness had formed an opinion which he had committed to writing. See also 40 Cyc. 2187.

One other question requires notice. Defendants suggest that the suit should have been brought by Mrs. Bradley as executrix. Since she was sole devisee and legatee under her husband's will, and, according to evidence introduced by defendants, the value of the personal estate was more than $50,000, it could make no difference to defendants whether the suit was brought in plaintiff's individual or representative capacity. But we think the question is determined by the decision in *Webb* v. *Janney,* 9 App. D. C. 41, where it was ruled that a suit in equity to rescind a conveyance of land for fraud must be brought in the name of the heirs at law or devisees of the injured party.

Decree reversed, with costs, and cause remanded for further proceedings not inconsistent with this opinion.

*Reversed and remanded.*

Mr. Chief Justice Smyth dissenting:

I dissent because I believe the action is barred by the Statute of Limitations, and, if not, equity has lost jurisdiction of the Davidsons.    Our Code says that no action of this character "shall be brought after three years from the time when the right to maintain such action shall have accrued."   Sec. 1265 [ 31 Stat. at L. 1389, chap. 854].    The properties involved were exchanged on December 9, 1910, and the representations complained of became effective on that date.   This action was not commenced until April 28, 1915, or more than four years after the making of the representations.   In equity "where relief is asked on the ground of actual fraud, especially if such fraud has been concealed, time will not run in favor of the defendant until the discovery of the fraud, or until, with reasonable diligence, it might have been discovered."   Kirby v. Lake Shore & M. S. R. Co. 120 U. S. 130, 136, 30 L. ed. 569, 572, 7 Sup. Ct. Rep. 430.   See also cases cited therein, and Lewis v. Denison, 2 App. D. C. 387.   The obligation to allege and prove the time when the fraud was discovered is on the party who asserts it. In Wood v. Carpenter, 101 U. S. 135, 140, 141, 25 L. ed. 807–809, it is said:   "A party seeking to avoid the bar of the statute on account of fraud must aver and show that he used due diligence to detect it, and, if he had the means of discovery in his power, he will be held to have known it."   And also:   "In this class of cases the plaintiff is held to stringent rules of pleading and evidence, 'and especially must there be distinct averments as to the time when the fraud, mistake, concealment, or misrepresentation was discovered, and what the discovery is, so that the court may clearly see whether, by ordinary diligence, the discovery might not have been before made.'   *   *   *   'This is necessary to enable the defendant to meet the fraud and the time of its discovery.' "   See also Hardt v. Heidweyer, 152 U. S. 547, 559, 38 L. ed. 548, 552, 14 Sup. Ct. Rep. 671; Stearns v. Page, 7 How. 819–829, 12 L. ed. 928–932; Moore v. Greene, 19 How. 69–72, 15 L. ed. 533, 534; Beaubien v. Beaubien, 23 How. 190, 16 L. ed. 484; Badger v. Badger, 2 Wall. 95, 17 L. ed. 838; Buckner v. Calcote, 28 Miss. 432–

434; *Nudd* v. *Hamblin*, 8 Allen, 130; *Salinger* v. *Black*, 68 Ark. 149, 60 S. W. 229; *Mason* v. *Henry*, 152 N. Y. 529, 46 N. E. 837. Appellant did not allege nor offer to prove that her husband before his death was not fully aware of all the misrepresentations of which she complains. "Having failed to do this, they are [she is] barred by the statute pleaded from maintaining this suit." (*Salinger* v. *Black* and *Mason* v. *Henry*, supra.) Since the statute commenced to run during the lifetime of Mr. Bradley, his death did not suspend it; for it is the law that, "after it has begun to run, its running will not be suspended because of the subsequent death of either party, or because of the lapse of time before either has a personal representative." *Handy* v. *Smith*, 30 W. Va. 195, 3 S. E. 604; see also *Boyd* v. *Munro*, 32 S. C. 249, 10 S. E. 963; *Campbell* v. *Wilson*, 2 Mackey, 497. Mr. Bradley sustained an injury in December and died in the following January. From this it is sought to draw the inference that he did not know of the fraud; but, as I have just observed, there is no pleading to support such an inference.

If, however, we assume, without allegation or proof, which we may not do, that Mr. Bradley had no knowledge of the fraud, how is it with the plaintiff, Mrs. Bradley? She signed with him the deed of the Columbia Road property; therefore participated in the exchange. Under the will of her husband, all his property became hers; hence, the right to maintain this action. The will was admitted to probate in Maryland February 7, 1911, nearly four years before the inauguration of the present suit. Plaintiff alleges that some time after April 8, 1912, "she became suspicious of the character of said exchange," and that "after an investigation * * * she recently discovered" that the value of the property had been misrepresented. It took her then, according to this allegation, more than three years to make the discovery. This does not establish much diligence. The allegation, however, is in effect denied, for the Davidsons in their answer charge laches, and assert that plaintiff's "cause of action did not occur within the three years prior to the filing of this suit." But that apart, the allegation is not sufficiently definite. The Supreme Court of the United States in *Wood* v.

*Carpenter,* supra, ruled that the following statement was de-
murrable: "And the plaintiff further avers that he had no
knowledge of the facts so concealed by the defendant until the
year A. D. 1872, and a few weeks only before the bringing of
this suit." Commenting on this the court said: "A general
allegation of ignorance at one time and of knowledge at an-
other are of no effect. If the plaintiff made any particular dis-
covery, it should be stated when it was made, what it was, how
it was made, and why it was not made sooner." (101 U. S.
p. 140.) In the case at bar the plaintiff satisfied none of these
requirements.

.Even if her allegation were sufficient, her proof would not
sustain it. Her counsel, in the course of the trial, said with
reference to April 8, 1912: "This is when we discovered that
the property was not what it was represented to be." Here is
a distinct admission that on that date she knew of the fraud.
That was more than three years before suit was brought. The
answer made to. this is that she did not then know that the
Davidsons, Bradley's agents, had accepted commissions from
the other side and thereby committed a fraud upon her husband.
*Forrest* v. *Wardman,* 40 App. D. C. 520; *Fox* v. *Patterson,* 43
App. D. C. 484; *Mannix* v. *Hildreth,* 2 App. D. C. 259. If
this constitutes a part of her cause of action, she is in the same
plight touching it as with respect to the misrepresentations.
She has neither alleged nor proved that she was not fully aware
of it at the time it occurred, and hence has not brought herself
within the doctrine of the Wood Case.

Even if it were otherwise, knowledge that the Davidsons
had received commission from the other side was not necessary
to her cause of action, and formed no part of it. Her suit is
for misrepresentations. If she prevailed, her damages would
be compensatory, not punitive. The fact that the misrepre-
sentations were made by an agent who had been guilty of an-
other fraud could not in any way affect the cause of action, or
the amount of damages to which she would be entitled. Fraud
in *fact* is not essential to actionable misrepresentations.
"Whether the party thus misrepresenting a fact knew it to be
false, or made the assertion without knowing whether it were

true or false, is wholly immaterial; for the affirmation of what one does not know, or believe to be true, is equally, in morals and law, as unjustifiable as the affirmation of what is known to be positively false." *Smith* v. *Richards,* 13 Pet. 26, 36, 10 L. ed. 42, 47; see also *Cooper* v. *Schlesinger,* 111 U. S. 148, 28 L. ed. 382, 4 Sup. Ct. Rep. 360; 20 Cyc. 36; 12 R. C. L. sec. 94.

After her husband's will was admitted to probate, a caveat was filed against it. Long litigation followed. Finally appellant succeeded. It is said that while the probate contest was pending she could not bring action against the Davidsons, because her right to do so came to her from the will, and that was in question. There are two answers to this. In the first place, under the laws of Maryland where the probate contest was tried, the fact that a caveat had been filed, and the validity of the will thereby drawn into question, did not prevent her as sole executrix from suing to conserve the estate. *Munnikhuysen* v. *Magraw,* 35 Md. 280; *Pacy* v. *Cosgrove,* 113 Md. 315, 77 Atl. 1114. Even if this were not true, the statute was not suspended by the litigation, because there is no provision in our Statute of Limitations which says so. The statute makes several exceptions, but that is not one of them. Since it is not, we have no right to read it into the statute. Many years ago it was said by Chancellor Kent: "The doctrine of any inherent equity creating an exception as to any disability, where the Statute of Limitations creates none, has been long, and, I believe, uniformly exploded." *Demarest* v. *Wynkoop,* 3 Johns. Ch. 142. The same view is expressed in different language by the supreme court of California in *Tynan* v. *Walker,* 35 Cal. 634, 95 Am. Dec. 152. "The clause," said the court, " 'after the cause of action shall have accrued,' does not, in our judgment, imply, in addition, the existence of a person legally competent to enforce it by suit. * * * Obviously, if the term 'right of action' implies the existence of a person competent to commence an action, there was no occasion for special provisions relieving persons not competent from the operation of the statute." This language is applicable to our statute. Considered, therefore,

from any angle, appellant's action is barred by the Statute of Limitations.

But if it were not, the case would have to be affirmed because equity lost jurisdiction over the Davidsons. The bill, as we have seen, charged that they misrepresented the value of the apartment house and induced Bradley to exchange his property for it; that, while acting as Bradley's agent, they secretly and fraudulently served as the agents of O'Neill, or the real owner of the apartment house, and were paid commissions by him or the real owner; that O'Neill was a straw man used by them as a channel to secure for their own use the Columbia Road property; that when O'Neill paid the commission he and those representing him knew that the Davidsons were the agents of Bradley, and that, by reason of the fraud alleged, the Davidsons obtained for their own use the Columbia Road property, or an interest in the same, or a cash consideration in lieu thereof. If the allegations that the Davidsons by fraud had acquired an interest in the property were true, equity would have jurisdiction for the purpose of effecting a reconveyance and an accounting. The Davidsons, however, deny that they ever acquired the Columbia Road property or any interest therein, and no one testifies that they did. Nor did they have any interest in the apartment house. When counsel for plaintiff was interrogated by the court as to whether he would endeavor to establish that they had, he answered: "I am not going to offer any testimony upon that point. I am going to rely upon this situation that they got a commission of $400 from the other side. * * * They necessarily had an interest in the Fillmore apartment to the extent of $400." We cannot assent to this. Proof that the owner corrupted the Davidsons by paying them a commission was not proof that they had an interest in the property.

It was said that they were in combination with O'Neill, or the real owner, to the end that they might secure the title, and that since equity has jurisdiction over O'Neill for the purpose of ordering a reconveyance and an accounting, if necessary, it also has power over the Davidsons. But there is no proof of any combination whatever between them and O'Neill. The

Davidsons deny it. They say that whatever dealings they had were with Simpson and Sullivan, O'Neill's agent. O'Neill testified that he never met or knew either of the Davidsons before the trial in the lower court, where one of them was pointed out to him; that he would not know the other one if he saw him, and that he never had any communication with the Davidsons concerning the exchange "in any shape or form." This is uncontradicted. His admission of the combination, by not answering the allegations of the bill, is not binding upon the Davidsons, because it was made long after the object of the conspiracy had been effectuated. "After the accomplishment or abandonment of the common design, no declaration of a conspirator will affect another, and such declarations, if offered in evidence, should be excluded." 1 R. C. L. p. 520, § 61; see also *Brown* v. *United States,* 150 U. S. 93, 98, 37 L. ed. 1010, 1013, 14 Sup. Ct. Rep. 37; *Spies* v. *People,* 122 Ill. 1, 237, 3 Am. St. Rep. 320, 12 N. E. 865, 17 N. E. 898, 6 Am. Crim. Rep. 570; *United States* v. *Gunnell,* 5 Mackey, 196; *People* v. *McQuade,* 1 L.R.A. 273 and note, (110 N. Y. 284, 18 N. E. 156). If Simpson and Sullivan, not parties here, corrupted the Davidsons by paying them a commission, that would not prove or tend to prove a conspiracy between the Davidsons and O'Neill without some proof that the latter had authorized or approved it, and there is none. From the mere fact of an agency to sell a piece of real estate, we cannot infer an authority to do an unlawful thing. *Benton* v. *Minneapolis Tailoring & Mfg. Co.* 73 Minn. 498, 506, 76 N. W. 265. Since, then, the Davidsons had no interest in the properties exchanged, and were not combined with O'Neill, the alleged owner, or the actual owner whoever he may be, there was no occasion for applying to equity for relief. The law provided an adequate remedy in an action for damages on account of the misrepresentations, if any, made by the Davidsons, and they were entitled to a jury trial of the facts involved in the controversy.

In saying this I do not forget the principle that, where equity has jurisdiction for one purpose, it will retain it for all purposes necessary to do full justice to the parties. It is also true that, where the equity asserted fails, the court will not retain

the action for the purpose of giving relief obtainable at law. "The rule is that where a cause of action cognizable at law is entertained in equity on the ground of some equitable relief sought by the bill, which it turns out cannot, for defect of proof or other reason, be granted, the court is without jurisdiction to proceed further, and should dismiss the bill without prejudice." *Dowell* v. *Mitchell,* 105 U. S. 430, 432, 26 L. ed. 1142, 1143, citing other cases; see also *Dakin* v. *Union P. R. Co.* 5 Fed. 666; *Kessler* v. *Ensley Land Co.* 123 Fed. 567. The equity charged against the Davidsons failed, as we have seen, and hence the ground upon which equitable jurisdiction rested disappeared. The circumstance that equity had power over O'Neill to order a reconveyance and an accounting, if found proper, makes no difference, since O'Neill and the Davidsons were not in combination. The equity which will permit the court to retain the case must affect the party over whom the jurisdiction is exercised. *Bradford* v. *Long,* 4 Bibb, 225. If this were not so, a plaintiff could deprive a defendant of a jury trial by joining him with a defendant against whom there was an equitable claim. But this cannot be done.

It is said that it was necessary for the plaintiff to go into equity for the purpose of discovering that the Davidsons had received commissions from both sides. If the fact that the plaintiff desired to obtain information from her opponents entitled her to maintain an equitable action against them, where otherwise she would have to proceed at law, it would be in the power of every plaintiff to make his action one cognizable in equity, and thereby deprive the defendant of his constitutional right to a trial by jury. Manifestly, this is not the law.

A court of equity will always punish fraud with an unsparing hand when the subject is properly before it, which is not the case here. If the plaintiff ever had a cause of action against the Davidsons, a matter about which I express no opinion, it was in law, not in equity; and were it not for the bar of the statute, the case should be reversed, with directions to the lower court to permit the plaintiff, if so advised, to transfer her cause

to the law side of the court. But since, in my judgment, it is barred, the case should be affirmed.

A motion for a rehearing was denied February 25, 1918, but the decree was amended so as to remand the cause for a new trial.